**Tyrone WERTS, Appellant**

v.

**Donald T. VAUGHN; the District Attorney of the County of Philadelphia; the Attorney General of the State of Pennsylvania**

No. 98–1764.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1999.

Filed Sept. 8, 2000.

Jeffrey M. Miller, Susan J. Bruno, (Argued), Nasuti & Miller, Philadelphia, PA, Counsel for Appellant.

Marilyn F. Murray, (Argued), Assistant District Attorney, Donna G. Zucker, Chief, Federal Litigation, Ronald Eisenberg, Deputy District Attorney Law Division, Arnold H. Gordon, First Assistant District Attorney, Lynne Abraham, District Attorney, Office of District Attorney, Philadelphia, PA, Counsel for Appellees.

Before: MANSMANN, McKEE and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal, we are asked to decide whether a habeas petitioner, who is presently serving a mandatory term of life imprisonment upon a conviction for second degree murder, was denied his constitutional right to a fair trial due to the prosecutor's alleged misconduct during the opening and closing arguments of his state court trial. The petitioner also contends in the alternative that he was denied effective assistance of counsel to the extent trial counsel failed to preserve his due process claim. With one exception, we find the petitioner's due process claim is procedurally defaulted. As to the nondefaulted due process issue, we find no merit to petitioner's claim. Moreover, we find that the state appellate courts' application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to petitioner's ineffectiveness claims was not objectively unreasonable. Accordingly, we

will affirm the judgment of the District Court.

## I.

The facts of this case are not disputed. On December 3, 1975, following a jury trial in the Court of Common Pleas of Philadelphia County, petitioner, Tyrone Werts, was convicted of second degree murder, robbery, criminal conspiracy, and possession of an instrument of a crime. We set forth the facts leading to Werts' arrest and conviction below.

Atlee Moore, a co-defendant, testified that on the date of the crime, he was home drinking when his friend, William Jones, stopped by and suggested they rob someone or some place. Moore suggested they rob a speakeasy, Shirley's, located on West Arizona Street in Philadelphia, Pennsylvania. Jones agreed and the two men then joined forces with the other co-defendants, Levan Spann, Bruce Norris, and Werts. The five co-defendants drove off in Spann's car towards Shirley's, with Spann at the wheel and Werts seated in the front passenger seat. Jones, Moore and Norris were positioned in the back seat of Spann's car. It was agreed that Spann and Norris would commit the robbery since both Moore and Jones were known and could subsequently be identified by the patrons at Shirley's.

Spann and Norris exited the vehicle and retrieved a shotgun and a pistol from the trunk of Spann's car which they hid in their clothing. They then proceeded into Shirley's. While Spann and Norris entered the speakeasy, Jones stood on the steps outside and Moore walked to a nearby alley. Werts remained seated in the front passenger seat of the car. Suddenly, a shot rang out and shortly thereafter, Spann and Norris swiftly exited the speakeasy. Quick on their heels, Moore and Jones followed Spann and Morris back to the car. Moore asked Spann and Norris what happened and Spann replied that Norris had shot someone. In fact, William Bridgeman had been shot and killed during the robbery which yielded a total sum of $35.

Spann dropped off the co-defendants one-by-one after their quick get-away from Shirley's. The next day, Moore turned himself in to the police upon learning that the police were looking for him in connection with the robbery and murder at Shirley's. Moore negotiated a deal with the prosecutor—he agreed to testify against Werts and the other co-defendants. In exchange, the prosecution agreed to charge Moore with a lesser offense, general murder, recommend that the sentencing court give serious consideration to leniency, arrange for Moore's bail to be reduced from $120,000 cash to $60,000 ROR, and get a federal detainer lifted so he could be released.

One month later, Werts was arrested in his home by a "phalanx" of police officers, armed with pistols and shotguns, who stormed the house and broke down the door with an axe. Werts was found hiding in a crawl space above a bedroom closet. The search and arrest of Werts was led by Detective McMillan, who was alleged to have beaten and bullied Werts at the time of his arrest. The police searched Werts' house for the murder weapon to no avail. Werts was then taken into custody where, without the benefit of counsel, he waived his *Miranda* rights and gave an incriminating statement to one of the homicide detectives. In essence, Werts stated that he was present when the other co-defendants decided to rob Shirley's, refused to go inside the speakeasy, and later disposed of the weapons.

Werts was tried separately from the other co-defendants. He testified that on the evening of the robbery and murder, he had been drinking heavily at a birthday party with three men, none of whom was one of the co-defendants. Werts testified that he became very drunk and stepped outside where he encountered Bruce Norris. Werts offered Norris five dollars to drive him home because he was too drunk

to drive himself. Werts climbed into the front passenger seat of Norris' car and while waiting for Norris, fell into a deep sleep. Werts testified that the next thing he remembered was being awakened by the other co-defendants as they scrambled back into the car after the robbery and heard one of them say that Norris had shot someone. Werts denied being involved in planning the robbery or disposing of the weapons thereafter. No one disputes the fact that Werts did not enter the speakeasy.

The prosecution's case against Werts boiled down to Moore's testimony that Werts was present and to Werts' confession to the police that he disposed of the weapons. Consequently, the government's case against Werts would succeed or fail based on the strength of the alleged confession and Werts' credibility.

Werts attacked the accuracy and voluntariness of the alleged confession on the basis that he was suffering from increased back pain, brought on by police brutality which aggravated a prior back injury, and by heroin withdrawal at the time of the interrogation which seriously impaired his ability to give an accurate and voluntary statement. Werts presented the expert testimony of a psychiatrist, Dr. Nelson, on this issue who was allowed to give his professional opinion regarding the impact of trauma sustained at the time of the arrest to Werts' pre-existing lower back injury, a heroin addict's craving for heroin if he had not had an injection for 48 hours, the amount of stress from an intense craving for heroin, and about Werts' ability to resist his interrogators when he is under this mental stress. Dr. Nelson was not permitted, however, to give his professional opinion as to what the effect of an intense craving for heroin would be on Werts' ability to make a rational decision or as to Werts' primary motivation during his interrogation.

Werts also attempted to rebut the inference of guilt that flowed from Detective McMillan's testimony that Werts had been found hiding in a crawl space. In this regard, Werts attempted to explain that he was hiding from the police because he was afraid of them due to a prior encounter in 1969 when he was shot in the spine by the police and suffered serious injuries. The trial court, however, refused to allow Werts to explain why he was hiding.

After the jury returned a verdict of guilty as to all charges, Werts filed post-trial motions in which he raised, *inter alia*, prosecutorial misconduct during the closing statement, specifically focusing on the prosecutor's comment that Moore would be a "marked man" if sent back to prison. The trial court upheld its denial of Werts' motion for a mistrial after the prosecutor completed his summation, finding that the prosecutor's remarks were motivated in part by the conduct and statements of defense counsel in his closing statement. Thus, the trial court concluded that the statements did not constitute reversible error. After denying his post-trial motions, the trial court sentenced Werts to a mandatory term of life imprisonment for second degree murder, a consecutive term of five to ten years for criminal conspiracy, and concurrent terms of five to ten years for robbery and two and one-half to five years for possession of an instrument of a crime.

Through trial counsel, Colie B. Chappelle, Esquire, Werts appealed his sentence and conviction directly to the Pennsylvania Supreme Court. In his direct appeal, Werts raised numerous claims of error in which he argued that he was denied a fair trial by the prejudicial and improper comments of the prosecutor including, but not limited to, the comment that Moore was a "marked man." Werts specifically referenced several other allegedly improper comments made by the prosecutor, none of which are at issue in the federal habeas petition before us. In his direct appeal, Werts further argued that the trial court's denial of his motion for a mistrial based on prejudicial remarks by Detective McMillan regarding stolen

clothing,[1] the prosecutor's inflammatory characterization of Werts as a dope addict and thief, and the prosecutor's inflammatory remark that Moore was a "marked man" violated his right to a fair trial and due process and therefore constituted reversible error.

The Pennsylvania Supreme Court affirmed the judgments of sentence and conviction in a published opinion. *See Commonwealth v. Werts*, 483 Pa. 222, 395 A.2d 1316 (1978). In a footnote, the Pennsylvania Supreme Court noted that it considered, but dismissed for lack of merit, numerous assertions of error, including:

> ... 5) that the trial court erred in not declaring a mistrial on the grounds that the prosecutor made an allegedly prejudicial remark during his summation; 6) that the trial court erred in not declaring a mistrial on the grounds that Detective Lerough McMillan made an allegedly prejudicial remark during his testimony; ... 10) that the prosecutor acted improperly in misstating the evidence during summation; ...

483 Pa. at 226 n. 2, 395 A.2d at 1318 n. 2. It is clear from Werts' brief that the challenged remark at the heart of the fifth contention above is the prosecutor's statement that Moore would be a "marked man" if he was returned to prison. At the base of the sixth "meritless" contention is Detective McMillan's statement that during the search of Werts' house, he found several articles of clothing that had been reported stolen. Finally, the underlying comment at issue in contention ten is the prosecutor's misstatement in his closing that Moore testified that Werts stated "I'm not going in there" during a conversation with Atlee Moore regarding the planning of the robbery. Thus, Werts did not raise, and the Pennsylvania Supreme

Court did not consider, on direct appeal any due process challenges based on the prosecutor's remarks to the effect that (1) Detective McMillan thought Werts was a killer; (2) people in Werts' neighborhood decide to commit robbery for no reason; and (3) he personally vouched for the credibility of homicide Detectives McMillan and Dougherty.

On May 15, 1979, Werts filed a *pro se* petition for collateral relief under the Pennsylvania Post Conviction Hearing Act ("PCHA"), 19 P.S. §§ 1180–1 *et seq.* (1966), as amended.[2] New counsel, Louis Lipschitz, Esquire, was appointed to represent Werts in the state collateral proceeding. Counsel filed an amended petition in which he alleged Werts was deprived of his right to effective assistance of counsel at trial, in post-trial motions and on direct appeal. Essentially, Werts argued that Attorney Chappelle was ineffective for failing to raise objections during trial and closing argument, failing to move for a mistrial on several occasions, and for failing to preserve certain issues in written post-trial motions or on direct appeal. The alleged errors of counsel which are pertinent to this appeal include: (1) Chappelle's failure to object to the prosecutor's comment in his opening statement that Moore "is obviously going to put his life in his hands by testifying," failure to request a mistrial, to raise the issue in post-trial motions and to raise and preserve the issue for appellate review; and (2) Chappelle's failure to object, to request timely cautionary instructions, to move for a mistrial and to preserve for appeal all of the following comments of the prosecutor in his closing argument: (a) that Detective McMillan thought Werts was a killer; (b) Moore was a "marked man"; (c) that peo-

---

1. At trial, defense counsel lodged a timely objection to Detective McMillan's unsolicited response regarding the clothing. The trial court denied his motion for a mistrial and gave a cautionary instruction which, defense counsel argued on direct appeal, failed to extinguish the prejudicial ·nature of the re-

sponse and remove its taint from the minds of the jurors.

2. In 1982, the PCHA was superseded and replaced by the Post Conviction Relief Act ("PCRA"), 42 Pa.Cons.Stat.Ann. §§ 9541 *et seq.*

ple in Werts' neighborhood decide to commit robbery "out of the clear blue;" and, (d) that Werts is a dope addict and thief and maybe the jury should not believe what he says. The PCHA court held an evidentiary hearing at which both Werts and trial counsel Chappelle testified and, on September 21, 1983, finding no merit to any of Werts' contentions, denied his petition for post-conviction relief.

■ Now represented by Samuel C. Stretton, Esquire, Werts appealed the PCHA court's judgment to the Pennsylvania Superior Court. In this appeal, counsel raised for the first time a due process challenge. Specifically, Werts argued that the prosecutor and Detective McMillan denied Werts his right to due process by making the following comments which were either not timely objected to or not preserved for appeal by trial counsel: (1) the prosecutor's comment during closing argument that Detective McMillan thought Werts was a killer; (2) the prosecutor's comment during closing argument that Moore was a "marked man;" (3) the prosecutor's statement during closing argument that Werts is an addict and a thief and maybe the jury should not believe him; and (4) the prosecutor's remark during closing argument that people in Werts' neighborhood decide to commit robbery for no reason.[3] In addition, Werts also argued that PCHA counsel was ineffective for failing to raise some of these issues in his amended petition for collateral relief.[4]

The Superior Court rejected these claims in a memorandum opinion dated August 2, 1985. *Commonwealth v. Werts*, 349 Pa.Super. 622, 503 A.2d 52 (1985). In rejecting Werts' arguments, the court failed to address the due process claims raised in Werts' brief other than to say that Werts was provided a fair trial. The Superior Court also failed to address Werts' argument that PCHA counsel was ineffective for failing to raise some of the issues raised in his brief filed with the court. The Superior Court did consider whether trial counsel's failure to raise a timely objection to certain prejudicial remarks made by the prosecutor violated Werts' Sixth Amendment right to effective assistance of counsel. The Superior Court held that trial counsel's failure to object to the improper statements did not amount to ineffective assistance of counsel. The court found that trial counsel failed to object to the statements based on a tactical decision which had a reasonable basis designed to serve the defendant's interests, *i.e.*, to refute the prosecutor's statement with evidence and/or to keep from drawing attention to the comment by objecting to it. Thus, the court declined to find ineffectiveness under those circumstances.

Werts subsequently filed a petition for allocator to the Pennsylvania Supreme Court, which was denied on February 3, 1986 without an opinion. *Commonwealth v. Werts*, No. 1016 (E.D. Allocator Docket 1985). In his brief in support of the petition, Werts raised the same arguments as those presented in his brief to the superior court with regard to due process and ineffective assistance of counsel. Almost ten years later, on January 23, 1996, Werts filed a second petition for state collateral relief, this time pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"). This petition was summarily dismissed on May 9, 1996; no appeal was taken.

On March 18, 1997, Werts filed a federal habeas corpus action in which he asserted four claims. In his first claim, Werts argues that certain improper statements of the prosecutor denied him his due process

---

**3.** Werts also referenced several other comments which are not at issue in this appeal.

**4.** The Constitution does not guarantee a right to counsel at state collateral review proceedings. Therefore, the Supreme Court has held that there can be no Sixth Amendment violation for ineffective assistance of counsel based upon representation at such proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (citations omitted).

right to a fair trial. To the extent that this issue was raised and/or considered on the merits on direct appeal to the Pennsylvania Supreme Court, Werts submits it was properly exhausted at that level and that the supreme court erred in rejecting the argument, for it is patently clear the prosecutor's remarks deprived Werts of a fair trial. To the extent that trial counsel either waived the issue at trial and/or failed to preserve it properly on appeal, Werts contends that this lapse constitutes ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments. Werts asserts two other claims in his federal habeas petition, neither of which is presently before us.[5]

■ The District Court assigned this case to a Magistrate Judge for a report and recommendation. With regard to Werts' first claim, the Magistrate Judge neither addressed nor ruled on Werts' allegation that the prosecutor's improper and prejudicial remarks denied him due process and a fair trial. Instead, the Magistrate Judge concentrated solely on Werts' alternative argument—that defense counsel's failure to object timely and thus preserve the issue of denial of a fair trial resulting from the prosecutor's prejudicial remarks constituted ineffective assistance of counsel in violation of the Sixth Amendment. In that regard, the Magistrate Judge held that a *Strickland* analysis applied. Under that standard, ineffective-

ness will not be found based on a tactical decision which had a reasonable basis designed to serve the defendant's interests. *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Magistrate Judge found that the Pennsylvania Superior Court's determination, that trial counsel's performance was not deficient under *Strickland* and did not prejudice the defendant, was reasonable. The superior court found, and the Magistrate Judge agreed, that defense counsel's actions in failing to object to the improper comments at the time they were made and waiting until the prosecutor finished his summation before moving for a mistrial was a reasonable strategy employed by counsel. Defense counsel testified at the PCHA hearing that he did not seek curative instructions out of a concern of the impact of highlighting these statements. The Magistrate Judge held that defense counsel's reasonable strategy not to highlight these statements through a request for curative instructions will not be deemed ineffective in hindsight.

Werts filed timely objections to the Magistrate Judge's Report and Recommendation in which he specifically emphasized the fact that the Magistrate Judge failed to address his due process argument. Nonetheless, the District Court approved and adopted the Report and Recommendation of the Magistrate Judge in an order and opinion filed on July 31, 1998,

5. The District Court dismissed the following claims and Werts has not appealed that portion of the District Court's decision. Werts' third claim challenges the state trial court's limitation of the presentation of his defense on the issue as to why he was hiding in the crawl space and the issue of use of expert testimony to establish the voluntary nature of his incriminating statement. Werts contended the trial court erred in improperly limiting his defense and that trial counsel was ineffective for failing to preserve this issue for appeal.

In his fourth claim, Werts contended that he was denied his right to a fair trial by an impartial jury where the trial court refused to permit counsel to ask prospective jurors during voir dire whether they would reject testi-

mony or evidence of a witness solely because he had been a drug user. The crux of the defense was that Werts' confession was the result of heroin withdrawal during interrogation. Given society's intensely negative view of drugs and drug abuse, Werts contended that the failure of the trial court to permit any inquiry into potential juror bias in this area raised a serious question concerning the ability of prospective jurors to consider the defense's contentions objectively. Moreover, Werts submitted that the prevalence of such bias in our culture, coupled with the prominent role of his drug abuse in his challenge to the alleged confession, cast doubt on the integrity of the voir dire proceeding and sufficiently undermined confidence in the outcome to warrant habeas relief.

without addressing the due process argument raised by Werts in his first claim—that the improper statements of the prosecutor denied him a fair trial. The District Court focused its analysis instead on Werts' claim that trial counsel was ineffective for failing to object to the prosecutor's improper comment in his opening statement that a co-defendant placed his life in danger when he agreed to testify against Werts, and failing to object to the improper comments of the prosecutor during his closing that (1) Detective McMillan thought Werts was a killer, (2) Werts was a dope addict and thief, and (3) Werts "casually decided to participate in the robbery."[6] *Werts v. Vaughn*, No. 97–1977, at 5 (E.D.Pa. July 31, 1998). Agreeing with the superior court, the District Court found that counsel's failure to object was motivated by his desire not to draw attention to these comments by objecting.[7] Thus, the District Court concluded that this "tactical decision was not deficient and certainly did not prejudice the petitioner." *Id.* at 4. Accordingly, the District Court concluded that defense counsel's decision not to highlight the comments was reasonable and would not be deemed ineffective in hindsight. *Id.* at 5.

The District Court further held that Werts' claims that counsel was ineffective for failing to object timely and failing to seek a curative instruction were defaulted. The District Court found that the superior court had rejected these claims because they were finally litigated and thus unreviewable.[8] *Id.* Since the highest state court has not ruled on the merits of these claims and would be precluded from doing so now for procedural reasons, the District Court held the claims were defaulted and cannot be reviewed absent a showing that a miscarriage of justice would occur. *Id.* Viewing the challenged comments of the prosecutor against the weight of the evidence, the District Court found they did not constitute grave error and therefore were unreviewable. *Id.* The District Court further stated in its July 31, 1998 order that there was no probable cause for appeal.

Werts filed a timely application for a certificate of appealability with us which we granted on June 14, 1999. A panel of our court found that Werts had made a substantial showing that he was denied his right to a fair trial due to prosecutorial misconduct and that he was denied his Sixth Amendment right to effective assistance of counsel due to counsel's failure to object in a timely fashion to the prosecutor's comments. Thus, on appeal, our review of the District Court's judgment denying Werts' petition for a writ of habeas corpus is limited to these issues.

█ We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the District Court's legal conclusions in a habeas proceeding and apply a clearly erroneous standard to factual findings in dispute. *See Rios v. Wiley*, 201 F.3d 257, 262 (3d Cir.2000); *Caswell v. Ryan*, 953 F.2d 853, 857 (3d Cir.1992) (citing *Bond v. Fulcomer*, 864 F.2d 306, 309 (3d Cir.1989)).

---

6. It appears that the District Court's paraphrase, "casually decided to participate in the robbery," refers to the prosecutor's comment that people in Werts' neighborhood haphazardly decide to commit crimes.

7. In addition to avoid drawing attention to the comment by objecting, defense counsel also thought he would refute the comment in the prosecutor's opening statement about a co-defendant fearing for his safety with evidence during the presentation of his case.

8. As explained *infra*, the District Court misstates the holding of the Pennsylvania Superior Court. Indeed, only Werts' claim, that counsel was ineffective for failing to object and seek a curative instruction to the prosecutor's remark during his *closing* that Moore would be a "marked man" if he returned to prison, was denied review by the superior court because this issue had been finally litigated in the direct appeal. Thus, the District Court's conclusion that all of Werts' claims of ineffective assistance of counsel arising out of the prosecutor's improper remarks were procedurally defaulted constitutes legal error.

## II.

Before turning to the merits of this appeal, we must first consider whether the due process claim and the claim of ineffective assistance of counsel for failing to raise or preserve the due process claim for appeal asserted by Werts in his federal habeas petition are properly before us. In the case of a person incarcerated from a judgment of a state court, a prerequisite to federal habeas review is that the petitioner have exhausted the remedies available to him in the state courts to the extent such remedies exist and are effective. 28 U.S.C. § 2254(b)(1) (1997). If a petitioner has the right under state law to raise, by any available procedure, the question presented, then he will not be deemed to have exhausted his available state court remedies. 28 U.S.C. § 2254(c) (1997). *See also Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997). This exhaustion requirement is predicated on the principle of comity which ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights. *Caswell,* 953 F.2d at 857 (citations omitted).

We previously explained the exhaustion requirement as follows:

A petitioner who has raised an issue on direct appeal, however, is not required to raise it again in a state post-conviction proceeding. Thus, the federal habeas claim must have been "fairly presented" to the state courts, *i.e.,* it must be the substantial equivalent of that presented to the state courts. In addition the state court must have available to it the same method of legal analysis as that to be employed in federal court. The habeas petitioner carries the burden of proving exhaustion of all available state remedies.

*Lambert,* 134 F.3d at 513 (internal citations omitted). We may excuse exhaustion, however, if requiring exhaustion would be futile, *i.e.,* exhaustion is impossible due to procedural default and state law clearly forecloses review of the unexhausted claim.[9] *Id.* at 518–19 (citations omitted); *see also Lines v. Larkins,* 208 F.3d 153, 159–60 (3d Cir.2000) (citing *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999)) (if state procedural rules bar a petitioner from seeking further relief in the state courts, exhaustion will be deemed satisfied since an absence of an available state corrective process exists).

Although exhaustion may be excused, we may nonetheless be precluded from reviewing the merits of claims deemed exhausted. In *Lines,* we recently held:

claims deemed exhausted because of a state procedural bar are procedurally defaulted, and federal courts may not consider their merits unless the petitioner "establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse the default." [*McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999) ]. *See also Coleman* [*v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ].

*Lines,* 208 F.3d at 160. *See also, Caswell v. Ryan,* 953 F.2d 853, 857 (3d Cir.1992) ("if a state court has refused to consider a petitioner's claims because of a violation of state procedural rules, a federal habeas court is barred by the procedural default from considering the claims, *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), unless the habeas petitioner can show 'cause' for the default and 'prejudice' attributable thereto,") (additional citations omitted).

The Supreme Court has delineated what constitutes "cause" for the pro-

---

9. A state procedural default occurs when "the state court refuses to hear the merits of the claim because either (1) the defendant waived a PCRA claim she could have raised in an earlier proceeding but failed to do so; or (2) some other procedural bar exists, such as a statute of limitations." *Lambert,* 134 F.3d at 518 (citation omitted).

cedural default: the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). By way of example, the Court opined that showing a factual or legal basis for a claim was not reasonably available to counsel or showing interference by government officials sufficient to make compliance impracticable, would constitute acceptable cause for federal habeas review of the defaulted claim. *Id.* Moreover, ineffective assistance of counsel has been deemed by the Supreme Court to fall within this standard. *Id.* The Court noted, however, that the exhaustion doctrine generally requires that an ineffective assistance claim "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.* at 488–89, 106 S.Ct. 2639.

With regard to the prejudice requirement, the habeas petitioner must prove " 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Id.* at 494, 106 S.Ct. 2639 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). This standard essentially requires the petitioner to show he was denied "fundamental fairness" at trial. *Id.* In the context of an ineffective assistance claim, we have stated that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir.1996).

In the alternative, if the petitioner fails to demonstrate cause and prejudice for the default, the federal habeas court may still review an otherwise procedurally defaulted claim upon a showing that failure to review the federal habeas claim will result in a "miscarriage of justice." Generally, this exception will apply only in extraordinary cases, *i.e.*, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent...." *Id.* at 496, 106 S.Ct. 2639. Thus, to establish a miscarriage of justice, the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him. *Schlup v. Delo*, 513 U.S. 298, 326, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

### III.

With these principles in mind, we turn to the facts of this case. In his federal habeas petition, Werts claims his right to due process was violated by certain improper comments made by the prosecutor during opening and closing arguments. With regard to the vouching statements,[10] this claim was not raised at trial, on direct appeal or in the state collateral review proceedings. Werts raises it for the first time in his federal habeas petition. Thus, although Werts has failed to exhaust his state remedies as to the vouching statements, he would be without a state corrective process if he were required to bring this claim in state court now. Indeed, he would be procedurally barred from obtaining state relief as his claim would be deemed waived under the PCRA, 42 Pa. Cons.Stat. Ann. § 9544(b) and/or barred by the one year statute of limitations under the PCRA, 42 Pa. Cons.

---

**10.** The prosecutor vouched for the credibility of the homicide detectives as follows:

These men are assigned to the Homicide Division of the Philadelphia Police Department, top division department. They are professionals. They have worked in the police department for a number of years. They have testified to that. They have been

employed as policemen for a number of years. If they had certain attitudes to color their thinking in cases, they would not be in the Homicide Division. They have to be professionals in work. They cannot bring in people and beat them every time they come in to get statements out of them. It just does not work like that.

Stat. Ann. § 9545(b). Under these circumstances, it would be futile to require exhaustion. Therefore, Werts is excused from the exhaustion requirement as to the vouching statements.

Werts' due process claim based on the prosecutor's vouching statements, however, is not reviewable here, despite excusable exhaustion, because this claim is procedurally defaulted. Thus, we may not consider the merits of Werts' due process argument regarding the vouching statements unless he has established "cause and prejudice" or a "fundamental miscarriage of justice." We find that not only has Werts not proven these elements, he has not even alleged their existence as a basis for relief. Accordingly, in this federal habeas case, we are precluded from reviewing Werts' due process claim predicated upon the vouching statements.

Werts's due process claim regarding the prosecutor's remark during his *opening* statement that a co-defendant was putting his life in danger by testifying against Werts, and the prosecutor's remarks in his *closing* statement that people in Werts' neighborhood commit crimes haphazardly and that Detective McMillan thought Werts was a killer, were not preserved for appeal because defense counsel failed to object timely at trial, failed to raise these claims in post-trial motions, and failed to raise these claims on direct appeal to the Pennsylvania Supreme Court or in Werts' amended PCHA petition. The first time Werts raised this due process argument was in his brief to the Pennsylvania Superior Court in his appeal from the trial court's denial of his PCHA petition. Under Pennsylvania law, these claims are deemed waived for PCHA purposes because they could have been raised at an earlier stage in the proceedings and were not. 19 P.S. § 1180–4(b) (1966). Moreover, Pennsylvania law also provides

that failure to preserve an issue for appeal results in the denial of review on appeal. *Sistrunk v. Vaughn,* 96 F.3d at 671 (citing Pa.R.App.P. 302(a) and *Commonwealth v. Labron,* 543 Pa. 86, 669 A.2d 917, 919 (1995), *rev'd on other grounds,* 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)). Indeed, the Superior Court refused to address Werts' due process claims raised for the first time in his appellate brief on collateral review to that court. Thus, Werts' due process claim as to these statements is procedurally defaulted. Moreover, because Werts has not alleged "cause and prejudice" or a "miscarriage of justice," we may not review these procedurally defaulted state claims.

Werts' last due process argument centers on the prosecutor's remark during his *closing* argument that Moore would be a "marked man" were he returned to prison. Defense counsel waited to object to this statement until after the prosecutor concluded his closing. The trial court ruled his objection was untimely and denied counsel's motion for a mistrial. Defense counsel raised this claim in post-trial motions and in his direct appeal to the Pennsylvania Supreme Court, which was subsequently denied as lacking in merit. This claim is not reviewable by the PCHA court because it was finally litigated on direct appeal. *See* 19 P.S. § 1180–4(a)(3)(1966).[11] Thus, Werts has exhausted his state remedies as to the due process claim regarding the "marked man" statement. Accordingly, this claim is reviewable by the federal habeas court.

Instead of arguing that cause and prejudice existed to excuse the procedural default or that a miscarriage of justice would result if the procedurally defaulted claims were not reviewed, Werts argued in his federal habeas petition that counsel's failure to object to the improper comments

---

**11.** The version of the PCHA in effect at the time Werts sought collateral review was codified at 19 P.S. §§ 1180–1 *et seq.* (1966). The PCHA was repealed effective June 26, 1982 and was replaced by the PCRA, 42 Pa. Cons. Stat. Ann. §§ 9541 *et. seq.,* as amended in 1988 and 1995.

at trial timely, to request a mistrial, to raise the issues in written post-trial motions, and to raise and preserve the due process issues for appeal constituted ineffective assistance of counsel in violation of the Sixth Amendment. The District Court appears to have held that all of Werts' claims of ineffective assistance of counsel arising out of the prosecutor's improper remarks were procedurally defaulted and thus unreviewable absent a showing that a miscarriage of justice would occur. Having found that the prosecutor's comments, when viewed against the weight of the evidence, did not constitute grave error, the District Court ruled that counsel's alleged ineffectiveness for failing to object and preserve the due process claims for appeal was not reviewable by the federal habeas court.

■ After reviewing Werts' briefs in support of his direct appeal to the Pennsylvania Supreme Court, and his amended PCHA petition and briefs to the superior and supreme courts on collateral review, as well as the opinions of the trial court denying post-trial motions and post-collateral relief, of the Pennsylvania Supreme Court on direct review, and of the superior court on collateral review, we find that the ineffectiveness claims based on counsel's failure to object to the improper comments of the prosecutor or to preserve these claims for appeal are not procedurally defaulted with the exception of the prosecutor's remark in his *closing* argument that Moore would be a "marked man" if he would return to prison.[12] In the state collateral proceeding, the superior court refused to review the ineffectiveness claim for failing to object to the "marked man" comment because Werts' due process challenge based on the "marked man" comment had been finally litigated on direct

review by the Pennsylvania Supreme Court.[13] The highest state court in Pennsylvania has never ruled on the merits of Werts' ineffectiveness claim based on the "marked man" comment during closing argument and would not do so now for procedural reasons. Thus, the ineffective assistance of counsel claim based on the "marked man" comment during *closing* argument has been procedurally defaulted.

PCHA counsel raised the ineffectiveness claim for trial counsel's failure to object to the remaining improper remarks of the prosecutor at the earliest opportunity in his amended PCHA petition. These claims were considered on the merits and rejected by the PCHA trial court, as well as the superior court on collateral review. Accordingly, the ineffectiveness claims based on the improper remarks of the prosecutor other than the "marked man" comment are reviewable in this federal habeas proceeding. We turn now to the merits of Werts' appeal.

IV.

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[14] which went into effect on April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. Since Werts filed his habeas petition on March 18, 1997, after the effective date of the AEDPA, we are required to apply the amended standards set forth in the AEDPA to his claim for federal habeas corpus relief. *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under 28 U.S.C. § 2254(a) (1997), a federal court is required to consider only petitions filed on behalf of individuals in

---

**12.** Any ineffectiveness claim based on counsel's failure to object to the vouching statements is also procedurally defaulted as this claim was never presented to the state courts as either a due process or ineffective assistance of counsel challenge.

**13.** The Pennsylvania Supreme Court rejected this claim as meritless without any discussion. *Commonwealth v. Werts,* 483 Pa. 222, 226 n. 2, 395 A.2d 1316, 1318 n. 2 (1978).

**14.** Pub.L. No. 104–132, 110 Stat. 1214 (1996).

custody pursuant to a state court judgment which are grounded on a violation of the Constitution or the laws or treaties of the United States. Moreover, the petitioner has to overcome the exhaustion hurdle described earlier, 28 U.S.C. § 2254(b) (1997).

▬▬▬ The AEDPA increases the deference federal courts must give to the factual findings and legal determinations of the state courts. *See Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir.1996). Federal habeas corpus relief is precluded as to any claim that was adjudicated on the merits in a state court proceeding unless such adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1) and (2) (1997). Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (1997).[15]

▬▬▬ On April 18, 2000, the Supreme Court issued a decision in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), in which the Court construed the new standard of review as set forth in amended section 2254(d)(1). Justice O'Connor delivered the opinion of the Court wherein she provided the following interpretation with respect to the standard of review:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established

Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523. The appropriate inquiry to be made under the "unreasonable application of" standard, the Court stated, was "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. In further delineating the "unreasonable application of" component, the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable. *Id.* at 1522.

▬▬▬ A little over one year before the Supreme Court's decision in *Williams*, we also construed the new standard of review under section 2254(d)(1) in *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir.1999), sitting *en banc*. There we held that section 2254(d)(1) requires a federal habeas court to make two inquiries:

> First, the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court prece-

---

15. The AEDPA also prescribes restrictions on when an evidentiary hearing may be held in a federal habeas case. *See* 28 U.S.C. §§ 2254(e)(2)(A) and (B) (1997). These sections of the statute are not at issue in this appeal.

dent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *O'Brien [v. Dubois]*, 145 F.3d [16, 24–25 (1st Cir.1998) ]. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an "unreasonable application of" Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

*Matteo*, 171 F.3d at 891. We believe our opinion in *Matteo* is in accord with the Supreme Court's decision in *Williams*. Indeed, one of the focuses of Justice O'Connor's opinion was the fact that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. *Williams*, 120 S.Ct. at 1519. Our opinion in *Matteo* also makes this distinction.

 To commence our analysis of the "contrary to" provision, we must first identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. *Matteo*, 171 F.3d at 888. We explained that to prove entitlement to habeas relief under the "contrary to" provision:

> it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent.

*Id.* If we determine that the state court decision is not "contrary to" the applicable Supreme Court precedent, then we are required to advance to the second step in the analysis—whether the state court deci-

sion was based on an "unreasonable application of" Supreme Court precedent. *Id.* In analyzing the "unreasonable application of" provision, we are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices. *Id.* (quoting *O'Brien*, 145 F.3d at 25) (other citations omitted). A contrary holding would amount to *de novo* review which we have held is proscribed by the AEDPA. *Id.* Thus, the appropriate inquiry at this juncture is whether the state court's application of Supreme Court precedent was objectively unreasonable. *Williams*, 120 S.Ct. at 1521; *Matteo*, 171 F.3d at 889–90. In other words, "[t]he federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo*, 171 F.3d at 890. We will apply this standard of review to Werts' due process and ineffective assistance of counsel claims seriatim.

### A.

 In light of the AEDPA's standard of review, we find that Werts is not entitled to federal habeas relief on the only reviewable due process claim, *i.e.*, that the prosecutor's reference to Moore as a "marked man" during closing argument so prejudiced the jury as to deny him a fair trial. In essence, Werts' claim sounds of prosecutorial misconduct. The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.' " *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to

result in the denial of the defendant's right to a fair trial.'" *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))). *See also Ramseur v. Beyer,* 983 F.2d 1215, 1239 (3d Cir.1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct " 'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Greer,* 483 U.S. at 765, 107 S.Ct. 3102)). This determination will, at times, require us to draw a fine line—distinguishing between ordinary trial error on one hand, and " 'that sort of egregious misconduct which amounts to a denial of constitutional due process'" on the other hand. *Ramseur,* 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 678 (3d Cir. 1976)).

In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial. *Ramseur,* 983 F.2d at 1239 (citing *Greer,* 483 U.S. at 766, 107 S.Ct. 3102). The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights. *Greer,* 483 U.S. at 766, 107 S.Ct. 3102 (citing *Donnelly v. DeChristoforo,* 416 U.S. at 639, 94 S.Ct. 1868).

We cannot say that the prosecutor's "marked man" comments during closing argument were sufficiently prejudicial in the context of the entire trial to violate Werts' due process rights. The trial court, in denying Werts' post-trial motions, rejected Werts' prosecutorial misconduct argument that the "marked man" comments prejudiced the jury's view of him. While the trial court made clear that it did not condone the remarks of the prosecutor, it nonetheless found that those remarks were motivated, at least in part, by the conduct and statements of defense counsel in his closing statement to the jury.[16] Viewing

16. Defense counsel in his closing stated:

Now, later on that day he [Moore] was supposed to have given a second statement, and we submit it was kind of difficult to get out of the Commonwealth's witnesses, Mr. Moore and also Detective Dougherty, as to what occurred in the second statement because at [sic] the second statement is some hours later and we submit perhaps after Mr. Moore had time to recollect or somebody had said something to him or whatever, he said [in the second statement] the man who was seated on the passenger's side of the car was James Johnson, and he picked out his photograph.

. . . . .

Now, we submit though when Mr. Moore took the stand because of what had been said at the time he entered the plea, because of the fact he knew why he was out, his bail had been changed so he could get out without putting out money, a Federal Detainer had been lifted, he knew he, he testified, he had to say something against the man who is seated here [indicating the defendant], who he described as the defendant ... Mr. Moore knew he had to testify in a manner to frame Mr. Werts in [sic] even though we submit he probably did not know who was seated in that car in view of the amount of liquor he had consumed that day, and the fact that he said that the people who were in the car he had never seen before in his life....

In his closing statement, the prosecutor responded:

If a person cooperates in the prosecution he is entitled to a recommendation of leniency, and that is all we agreed to. Now, something is made of the fact that he signed his own bail and was allowed to go home. Common sense. Tyrone Moore was in the Detention Center with other individuals. Now if Tyrone Moore had indicated he was going to testify against him and sent back to the Detention Center with these other individuals, he would be sent back as a marked man. We do not want to have Tyrone Moore wind up hanging from the top of a cell. So we let him sign his own bail so he could leave, so he would not be a marked man in the Detention Center, and he showed up every time. He showed up in this courtroom every time he was called, and he came in and testified in this case. You heard Tyrone Moore testify, and he said that he agreed to testify and he pled guilty, but there is something much more he said.

He said that he called the police when he found out that they were looking for him

the prosecutor's remarks in this light, the trial court concluded that the statements did not constitute reversible error. *Commonwealth v. Werts*, Nos. 1859, 1860, 1862 and 1863, *slip op.* at *4 (Nov. 13, 1976) (Bonavitacola, J.). On direct review of Werts' state conviction, the Pennsylvania Supreme Court found Werts' due process claim to be without merit and not warranting any discussion. 483 Pa. at 224 & 226 n. 2, 395 A.2d at 1317 & 1318 n. 2.

▬▬▬ The appellees argue that the prosecutor's "marked man" remarks in his closing statement were made in direct response to the argument of defense counsel that Moore had implicated others involved in the crime and had indeed agreed to "frame" Werts in order to obtain his own release on bail. While the prosecutor and defense counsel share a responsibility to confine arguments to the jury within proper limits, occasionally, during the heat of argument, counsel make remarks that are not supported by the testimony and which are or may be prejudicial to the defendant. *United States v. Young*, 470 U.S. 1, 8 & 10, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (citation omitted). Where, in a criminal trial, defense counsel argues improperly, thereby provoking the prosecutor to respond in kind, and the trial judge does not take any corrective action, a criminal conviction will not be "overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.* at

11, 105 S.Ct. 1038. Thus, in analyzing the effect of the prosecutor's remarks on the outcome of the trial, courts will consider the "invited response" or "invited reply" rule, *i.e.*, whether "defense counsel's comments 'clearly invited the reply.'" *Id.* (quoting *Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)).[17] Thus, "the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Id.* at 12, 105 S.Ct. 1038. This analysis requires the reviewing court to weigh not only the impact of the prosecutor's remarks, but also to consider defense counsel's statement. *Id.* If the prosecutor's comments were "invited," and went no further than required to "right the scale," such remarks would not warrant overturning a conviction. *Id.* at 12–13, 105 S.Ct. 1038.

In *United States v. Young*, the Supreme Court found that the remarks of the prosecutor, although motivated by defense counsel's closing argument, were improper and resulted in error. 470 U.S. at 16, 105 S.Ct. 1038. This error, however, did not rise to the level of plain error as the Supreme Court found the fundamental fairness of the trial was not undermined by the prosecutor's improper remarks, nor had they contributed to a miscarriage of justice.[18] *Id.* In so holding, the Supreme Court reasoned that any potential harm from the prosecutor's remark regarding his personal belief as to the guilt of the defendant was mitigated by the jury's understanding that the prosecutor was responding to de-

and he voluntarily cooperated with them from the very start. Before he was told that there would be any promise of leniency, before he was told that if he testified or pled guilty and testified we would recommend leniency. He cooperated from the very start because he knew what his participation was in the case and he went into the police station and he told them what he did, and he told them what happened. He told them that he did not know the names of the other individuals but he thought he heard some names that were said.

**17.** The Court noted that its recognition of the "invited response" rule in *Lawn* and earlier cases should not be construed as approval or encouragement of such improper remarks. Rather, the focus should be on "whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.* at 12, 105 S.Ct. 1038.

**18.** The Supreme Court applied the plain error standard of review in *Young* because defense counsel failed to raise an objection to the prosecutor's remarks at trial, but raised the issue for the first time on appeal.

**200**

fense counsel's repeated attacks on the prosecutor's integrity and defense counsel's argument that the evidence failed to establish a crime. *Id.* at 17–18, 105 S.Ct. 1038. The Court further reasoned that given the context of the prosecutor's remarks and the broadside attack from defense counsel, the jury was not influenced to stray from its duty to be fair and unbiased. *Id.* at 18, 105 S.Ct. 1038. Indeed, the jury acquitted the defendant in *Young* of the most serious charge he faced, which reinforced the Court's conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly. *Id.* at 18 n. 15, 105 S.Ct. 1038.

The Court also took into consideration whether the prosecutor's remark involving his personal opinion contained any suggestion that he was relying on information not presented to the jury which supported the charges against the defendant. *Id.* at 19, 105 S.Ct. 1038. Having concluded that the improper remarks did not contain any such suggestion, but, rather, were supported by the defendant's own testimony, the Court opined the jury understood the comment for what it was—a defense of the prosecutor's decision and integrity. *Id.* Finally, the Court noted that the record contained overwhelming evidence of the defendant's guilt which eliminated any lingering doubt that the prosecutor's remarks prejudiced the jury. *Id.* at 20, 105 S.Ct. 1038.

Like the prosecutor in *Young*, the prosecutor in this case appears to have made the "marked man" comments in response to defense counsel's closing statement. The prosecutor's reference to Moore as a "marked man" was in direct response to defense counsel's argument that his bail had been changed so he could get out of jail without posting a bond in exchange for testifying against Werts. Having re-

viewed the prosecutor's comments in view of the entire closing arguments made by both counsel and the evidence adduced at trial, we find that the prosecutor's comments were invited and, for the most part, went no further than required to "right the scale." After defense counsel's charge, the prosecutor was entitled to explain why Moore's bail had been changed. This necessarily entailed pointing out that a prisoner who cooperates with the prosecution is not looked upon favorably by his fellow inmates and that the Commonwealth's agreement to Moore's release on bail was a reasonable response to the realities of prison life. Up to this point, we do not find the comments of the prosecutor to be improper.

■ We think the prosecutor overstepped his bounds, however, when he remarked that the Commonwealth did not want to have Moore wind up hanging from the top of a cell. Although this comment is improper and resulted in error, in the overall context of the entire closing statements and record evidence, we do not find this one sentence was sufficient to unfairly prejudice the jury. At most, this single wayward statement amounts to an ordinary trial error, which is insufficient to constitute a denial of due process. The prosecutor never stated that Werts threatened Moore or that Werts would have Moore killed if he was sent back to the Detention Center.

We further find that while not overwhelming, the state trial record contains ample evidence of Werts' guilt, which further mitigates the possibility that the jury was prejudiced by the prosecutor's improper comment. The jury had before it Werts' confession and trial testimony, as well as the testimony of Moore, a co-defendant, and several other witnesses.[19] Spe-

---

**19.** We disagree with the dissent's dismissal of Moore's testimony as insufficient to overcome a "mere presence" defense, as well as his reference to Werts' confession as "coerced." As to the latter, this issue was raised on direct appeal to the Pennsylvania Supreme Court

and rejected. The District Court rejected Werts' allegation that the confession was not voluntary as a basis for habeas relief and Werts has not pursued this issue on appeal. Thus, the dissent's referral to the statement as "coerced" is inappropriate and cannot weigh

cifically, the other witnesses are Detective Dougherty, Detective McMillan, and Detective Verrugghe.

Detective Dougherty testified in pertinent part that he observed fresh brush burns on Werts' chest and back upon his arrival at the police station. Based on Detective Dougherty's testimony, a jury could certainly find that Werts' injuries were consistent with what you would expect to see when a shirtless individual is pulled through a two-foot by two-foot opening, (when Werts was apprehended above the closet), as opposed to injuries sustained in a beating. Detective Dougherty also stated that he gave Werts his *Miranda* warnings and Werts indicated that he understood his rights. Detective Dougherty testified during the interview that Werts appeared normal and responsive; he did not appear to be under the influence of drugs or alcohol. Detective Dougherty further stated that Werts did not complain to him of any physical ailments and refused medical treatment when asked if he wanted it. Detective Dougherty read into evidence the incriminating statement he took from Werts; the bottom of each page contained Werts' signature.

The portion of Detective McMillan's testimony which had a significant impact on the credibility of Werts' trial testimony (and his repudiation of guilt) was his statements to the effect that the events on the morning of Werts' arrest did not transpire as Werts described them. Detective McMillan testified that no one punched or kicked Werts, or sprayed mace in his face, or hit him in the mouth with a shot gun. In addition, Werts' guilt could also be inferred from Detective McMillan's testimony that Werts had been found hiding from police in a crawl space above a closet.

Finally, Detective Verrugghe's testimony corroborates Werts' statement in his confession to Detective Dougherty to the effect that Werts and Van drove to Werts' house after the shooting, and that Van stayed at Werts' house overnight. It defies logic to suggest that Werts paid someone just to drive him home because he was drunk when the white Ford Falcon was still parked outside Werts' residence the day after the shooting. Detective Verrugghe's testimony lends credibility to Werts' confession as opposed to his later denial at trial of his participation in the robbery.

Moreover, in its final jury charge, the trial court instructed the jurors that their factual finding should be based exclusively on the evidence presented during the trial and that their determination of the facts should not be controlled by expressions of opinion or comments on the facts by the prosecutor. The trial court further instructed the jurors that while they had a duty to consider the arguments of counsel, they had the right to reject any or all of these arguments. Considering the prosecutor's improper remark in the context of the entire trial, including the argument of defense counsel and the jury charge, we cannot say the prosecutor's improper remark was sufficiently prejudicial to violate Werts' due process rights. Therefore, the decisions of the state trial court and the Pennsylvania appellate courts comport with the clearly established Supreme Court precedent and do not involve an objectively unreasonable application of such law. Since the state court adjudication is neither contrary to, nor an unreasonable application of the Supreme Court precedent, Werts is not entitled to federal habeas relief on his due process claim.

### B.

We turn now to the merits of Werts' ineffective assistance of counsel claim. The prosecutorial remarks to which trial counsel failed to object and/or preserve for

in our decision here. As to Moore's testimony, it is significant that Moore was never asked whether Werts was awake or asleep.

Neither the prosecutor nor defense counsel chose to clarify this point.

appeal, which form the basis of Werts' ineffective assistance claim and which are not procedurally defaulted, include: (1) in the prosecutor's opening statement, that a co-defendant was putting his life in his hands by testifying, and in the prosecutor's closing argument, (2) that Detective McMillan thought Werts was a killer, and that (3) people in Werts' neighborhood commit crimes for no reason. The Pennsylvania Superior Court reviewed each of these statements and concluded that counsel was not ineffective for failing to object to these remarks of the prosecutor.

With regard to the statement made during the opening in which the prosecutor referred to the possibility that a co-defendant had jeopardized his personal safety by agreeing to testify for the government, the superior court found that defense counsel had exercised reasonable trial strategy in failing to object to this comment—he intended to refute the statement with evidence and did not want to draw attention to the comment by objecting to it. The court therefore declined to find "ineffectiveness based on a tactical decision which had a reasonable basis designed to serve a defendant's interests." *Commonwealth v. Werts*, No. 2762 Phil.1983, slip op. at 2 (Aug. 2, 1985) (citing *Commonwealth v. Anderson*, 501 Pa. 275, 461 A.2d 208 (1983)).

The remaining comments forming the basis of Werts' ineffectiveness claim were discussed collectively by the superior court. First, the superior court noted that at the completion of the prosecutor's closing argument, defense counsel raised an objection at sidebar to the remarks and moved for a mistrial based on prosecutorial misconduct which was denied. *Id.* The superior court further observed that defense counsel testified at the PCHA hearing that he did not seek curative instructions because he was concerned with the impact of highlighting these comments. *Id.* Upon a review of the record, the superior court concluded that the prosecutor's remarks did not warrant the declaration of

a mistrial. *Id.* The court's decision appears to be predicated on three bases: (1) the prosecutor's remarks could be construed as a proper response to defense counsel's argument (citing *Commonwealth v. Floyd*, 506 Pa. 85, 91, 484 A.2d 365, 368 (1984)); (2) the prosecutor drew legitimate inferences from the evidence of record (citing *Commonwealth v. Tucker*, 461 Pa. 191, 201, 335 A.2d 704, 709 (1975)); and (3) defense counsel's decision not to highlight these remarks through a request for a curative instruction was a reasonable strategy and would not be deemed ineffective in hindsight (citing *Commonwealth v. Anderson*, 501 Pa. 275, 461 A.2d 208 (1983)).

 At the time the superior court issued its decision, the controlling case governing ineffectiveness claims in Pennsylvania was *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967), which set forth the following test:

our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weighing the alternatives as we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis.

427 Pa. at 604–05, 235 A.2d 352–53. The court may not substitute its determination as to what course of action would have been more effective in promoting the defendant's interests for that of counsel. *Commonwealth v. Roundtree*, 469 Pa. 241, 249, 364 A.2d 1359, 1363 (1976). Thus, if the court determines that "counsel made an informed choice, which at the time the decision was made reasonably could have been considered as advancing and protecting the [defendant's] interests," counsel

will not be deemed ineffective. *Id.* (citing *Commonwealth v. Hill,* 450 Pa. 477, 482, 301 A.2d 587, 590 (1973)). Counsel is presumed to be competent and the defendant has the burden of proving otherwise. *Commonwealth v. Carpenter,* 555 Pa. 434, 725 A.2d 154, 161 (1999) (citation omitted); *Washington,* 427 Pa. at 603, 235 A.2d at 352. Moreover, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Carpenter,* 725 A.2d at 161 (citation omitted).

■ In 1987, the Pennsylvania Supreme Court reviewed the ineffectiveness standard set forth in *Washington* to determine whether that standard also included a prejudice requirement. *See Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). The court concluded that although *Washington* could be read as equating prejudice with the unreasonableness of counsel's performance,[20] thereby vitiating the need for showing actual prejudice, this language in *Washington* was inconsistent with the law as the supreme court has actually applied it. *Pierce,* 515 Pa. at 160, 527 A.2d at 976. Historically, Pennsylvania caselaw has clearly demonstrated that the supreme court measured counsel ineffectiveness by two components: (1) the reasonableness of counsel's conduct if it is determined that there is merit to the underlying claim and (2) how the ineffectiveness prejudiced the defendant. *Id.,* 515 Pa. at 158–59, 527 A.2d at 975.[21] To the extent *Washington* had been interpreted in past decisions to exclude prejudice from the analysis of ineffectiveness claims, the Pennsylvania Supreme Court overruled *Washington* and those decisions incorrectly interpreting *Washington.* 515 Pa. at 160–61, 527 A.2d at 976. The court further opined that the Pennsylvania standard judging ineffectiveness claims was

identical to the ineffectiveness standard enunciated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Pierce,* 515 Pa. at 161–62, 527 A.2d at 976–77.

■ In *Strickland,* the United States Supreme Court enunciated the test for ineffective assistance of counsel under the United States Constitution. This test has two components: First, the defendant must show that counsel's performance fell below an objective standard of reasonableness, 466 U.S. at 688, 104 S.Ct. 2052 and, second, the defendant must show he was actually prejudiced by counsel's deficient performance. *Id.* at 687, 104 S.Ct. 2052. A defendant asserting an ineffectiveness claim must prove both elements in order for the court to conclude that the conviction is unreliable. *Id.*

■ The Supreme Court proffered the following edification of the reasonableness component:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

---

**20.** If counsel did not have any "reasonable basis for acting in the manner he did, he prejudiced his client because counsel compromised his client's constitutional right to effective representation," so the argument goes. *Pierce,* 515 Pa. at 160, 527 A.2d at 976.

**21.** The requirement of showing actual prejudice existed prior to the superior court's decision in Werts' PCHA appeal. *See, e.g., Commonwealth v. Clemmons,* 505 Pa. 356, 361–62, 479 A.2d 955, 957–58 (1984); *Commonwealth v. Vogel,* 501 Pa. 314, 329, 461 A.2d 604, 612 (1983), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984).

*Id.* at 689, 104 S.Ct. 2052 (citation omitted). Thus, the court concluded that when deciding an ineffectiveness claim, the reasonableness of counsel's conduct must be judged in light of the facts of the particular case at the time the conduct occurred. *Id.* at 690, 104 S.Ct. 2052.

■ Turning to the prejudice component, the Court elaborated that for prejudice to be established, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ Our determination of whether the state appellate courts erred in denying Werts' ineffective assistance of counsel claim requires us to review the state courts' application of Supreme Court precedent to a particular set of facts. Here, the state appellate courts did not apply a rule of law that contradicts the Supreme Court's holding in *Strickland.* Accordingly, we find that the state appellate court's decision was not contrary to established Supreme Court precedent.

This conclusion does not end our inquiry, however, for we must also analyze Werts' ineffectiveness claim under the "unreasonable application of" provision of section 2254(d)(1). Under that provision, the appropriate inquiry is whether the Pennsylvania courts' application of *Strickland* to Werts' ineffectiveness claim was objectively unreasonable, *i.e.,* the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under *Strickland.*

---

**22.** Because we have concluded that Werts has not proved the reasonableness component under *Strickland,* we need not address the prejudice component. Indeed, the Pennsylvania Superior Court did not address the prejudice component in its analysis and thus we do not feel compelled to do so here.

We find that under the facts of this case, the Pennsylvania Superior Court's determination that trial counsel rendered effective assistance was not an unreasonable application of *Strickland.* Counsel's failure to object to the prosecutor's remark in the opening statement that Moore was taking his life in his hands by testifying for the government was based on reasonable trial strategy as explained by defense counsel at the PCHA hearing. There counsel testified that he did not object to the prosecutor's comment because he did not want to draw attention to it by continuously objecting, that he thought the statement "cut both ways," and because he thought the statement would "backfire" against the prosecutor because defense counsel "knew [he was] going to present evidence that [the prosecutor and Moore] had a deal and really that this guy was never in fear for his life." Counsel's explanation for his failure to object indicates that he employed what he believed to be sound trial strategy at the time. Moreover, Werts has not presented any legal authority or pointed to any evidence in the record which would overcome the presumption that counsel's performance constituted sound trial strategy. Thus, we hold that the judgment of the Pennsylvania Superior Court did not result in an outcome that cannot reasonably be justified under *Strickland.* Accordingly, Werts is not entitled to habeas relief on his claim of counsel ineffectiveness for failing to object to the prosecutor's remark in his opening regarding Moore's safety.[22]

The Pennsylvania Superior Court further held that Werts was not denied effective assistance of counsel with regard to defense counsel's failure to object to certain remarks of the prosecutor during the closing argument.[23] After objectively eval-

---

**23.** In finding counsel effective, the Pennsylvania Superior Court relied in part on the fact that defense counsel did object and move for a mistrial at the end of the prosecutor's closing as to all of the prosecutor's allegedly improper remarks. We note, however, that defense counsel objected to the motion for mistrial on the basis of prosecutorial miscon-

uating the merits of the Pennsylvania Superior Court judgment, we are convinced that the court's decision resulted in an outcome that can reasonably be justified under *Strickland.* The prosecutor's remark that Detective McMillan thought Werts was a killer was in direct response to defense counsel's statement in closing that the detective had a certain predisposition concerning the case and towards Werts, and whether or not McMillan was concerned for his well being. If the remarks themselves are not improper, counsel cannot be held ineffective for failing to object to them. Here, the prosecutor's remark that Detective McMillan thought Werts was a killer was an invited reply to defense counsel's statement and which went no further than required to "right the scale." *Young,* 470 U.S. at 12–13, 105 S.Ct. 1038. Accordingly, such remark was not improper and thus Werts cannot claim counsel ineffectiveness for failing to object to his remark.

Werts also claims counsel was ineffective for failing to object to the following remark of the prosecutor:

Moore testified that it was May 6th in the evening, and they went—he was at home drinking and they came to the house and Butch Jones came up to him and they went outside and Butch Jones was looking for a place to rob. Bear in mind, this is the way people are up there. They are sitting at home doing nothing and they decide to rob a place just out of the clear blue. And Butch Jones takes Tyrone Moore outside in the car and asked him "Do you know a place to rob?" And he said there is a Speakeasy over on Arizona Street and says Werts is there. Now Werts says he was asleep.

This remark of the prosecutor appears to be a fair comment on the evidence presented at trial, which established that Werts' accomplices were at Moore's house on the day of the crime, trying to decide on a place to rob. We note that there was never an argument made to the state courts that this remark was racially motivated and intended to inflame the jurors. Indeed, Werts argued in the state collateral proceedings that this remark amounted to improper personal opinion that the prosecutor believed he casually decided to participate in this robbery with his co-conspirators. *See* Brief for Appellant, Superior Court of Pennsylvania, No. 2762*PHL 83, at 16; Petition of Appellant for Allowance of Appeal to Pennsylvania Supreme Court, at 13. Our objective review of the record and the superior court's decision reveals no basis for federal habeas relief. We find the prosecutor was merely attempting to point out reasonable inferences from the evidence presented at trial. Accordingly, the prosecutor's remarks were not improper and counsel's performance cannot be deemed inadequate for failing to object to the remarks.

Moreover, defense counsel testified at the PCHA hearing that he did not file a timely objection or seek curative instructions for various reasons, including his concern over the impact of highlighting the remarks. In this regard, counsel stated that, in his opinion, even if he had made a timely objection, the court would have given curative instructions rather than grant his motion for a mistrial, and he was more concerned with further highlighting these statements and the additional harm done to the defendant. Counsel's decision not to draw attention to the remarks cannot be deemed unreasonable trial strategy in light of the facts of this case. Granted counsel also admitted he was too embarrassed to object during the prosecutor's closing and thought he could wait until the end. Indeed, counsel cited caselaw to support his position in both his post-trial motions and in his brief to the Pennsylvania Supreme Court. Nonetheless, these trial errors do

---

duct arising from the "marked man" comment only. Werts procedurally defaulted this claim and therefore it is not currently before

us. In any event, we do not find this discrepancy in the superior court's decision to be of any moment here.

not rise to the level of ineffective assistance of counsel. *See e.g., Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (finding no inequity in requiring petitioner to bear the risk of attorney error that results in a procedural default so long as counsel's performance is not constitutionally ineffective under *Strickland*); *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("Attorney ignorance or inadvertence is not 'cause' [for the procedural default] because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'")

 What *Strickland* requires is that counsel's performance meet an objective standard of reasonableness. We cannot say that under the facts presented here, counsel's failure to object was unreasonable. Werts has not proved either that the remarks were improper and therefore objectionable or that the basis for counsel's failure to object might not be considered sound trial strategy. We hold, therefore, that the Pennsylvania Superior Court's determination that trial counsel rendered effective assistance was not an unreasonable application of *Strickland*.[24] Accordingly, Werts is not entitled to federal habeas relief on his claim of counsel ineffectiveness for failing to object to the prosecutor's remarks.

### V.

For the reasons set forth above, we will affirm the judgment of the District Court denying Werts' petition for writ of habeas corpus.

McKEE, Circuit Judge, dissenting.

I respectfully dissent. The less than overwhelming evidence of Werts' guilt, combined with persistent prosecutorial misconduct, coalesced to deny Werts the

fundamental fairness that the Constitution guarantees. One can not read the transcript of Werts' trial without having grave misgivings about the integrity of the verdict. Accordingly, I think that it is clear that the district court erred in denying Werts' petition for habeas relief. In fact, the district court did not even consider Werts' most meritorious claim.

### I.

I agree with my colleagues' discussion of the standard of deference which must be afforded under the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). However, as the majority notes, the state courts did not adjudicate Werts' due process claim on its merits. Therefore, the deference we would normally afford a prior state adjudication on habeas review is, to a great extent, not implicated here. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877 (3d Cir.)(*en banc*), *cert. denied,* —— U.S. ——, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999). Moreover, to the extent that the state courts decided Werts' claim on collateral or direct review and ruled against him, I think it is clear that the state court adjudication is both "contrary to [and] an unreasonable application of, clearly established federal law, … as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Although, as the majority correctly notes, the Supreme Court has cautioned that we must review state court judgments with "utmost care," *Williams,* 120 S.Ct. at 1511, the Court has also emphasized that we are not to afford erroneous state court rulings such deference that we abandon our constitutional obligation to ensure the fundamental fairness of verdicts obtained in criminal proceedings.

In sum, [AEDPA] directs federal courts to attend to every state-court judgment with utmost care, but it does not require

---

**24.** Again, because we have determined Werts has failed to prove the first prong of *Strick-* *land,* we need not reach the prejudice element.

them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody ... violates the Constitution, that independent judgment should prevail.

*Williams*, 120 S.Ct. at 1511.

A careful review of the entire record in this case, as is required by Werts' due process claim, *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir.1992), clearly establishes that the prosecutor's unjustified and unethical conduct so seriously undermined the fairness of Werts' trial as to have resulted in a denial of due process.

"[E]rrors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ." *Williams*, 120 S.Ct. at 1503. Quite frankly, after reviewing the entire record here I simply do not understand how one can objectively have confidence in this jury's verdict. Given what happened during the course of this trial, it is a miscarriage of justice to let this verdict stand.

## II.

## "A MARKED MAN COMMENT"

During his closing the prosecutor argued:

Now, if Tyrone Moore had indicated he was going to testify against him and sent back to the Detention Center with these other individuals, he would be sent back as a marked man. We do not want to have Tyrone Moore wind up hanging

from the top of a cell. So we let him sign his own bail so he could leave ...[1]
App. at 144.

As the majority notes, Werts argued on direct appeal that the prosecutor's "marked man" comment denied him the due process of law. That due process claim was not addressed. The Pennsylvania Supreme Court simply stated in a footnote that the trial court did not err "in not declaring a mistrial on the grounds the prosecutor made an allegedly prejudicial remark during his summation...." *Commonwealth v. Werts*, 483 Pa. 222, 226, n. 2, 395 A.2d 1316, (1978). It is apparent from the brief that Werts submitted to the Pennsylvania Supreme Court that the remark the Court was referring to was the prosecutor's "marked man" comment. The PCRA court could not address this claim of error because it had been raised on direct appeal. *See*, 19 P.S. § 1180–4(a)(3) (1966).[2] Accordingly, as my colleagues conclude, Werts properly exhausted his contention that the remark denied him due process, and we may review the merits of that portion of his due process claim.

As the majority also correctly notes, "in evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial." *Ramseur*, 983 F.2d at 1239 (citing *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). However, after correctly stating the test, my colleagues apply the technical restrictions of exhaustion in such a way as to undermine the due process analysis re-

---

1. In an objection at side bar, defense counsel alleged that the prosecutor was referring to an incident that had recently received a great deal of publicity. Werts' attorney told the court:

I would move for a mistrial at this time. I believe the Assistant District Attorney made very inflammatory comments that are obviously directed at the Price sentence that has been highly publicized. Price was the one that was killed and Kevin Hunter was later

on killed who had been in jail. I think it was very inflammatory. Your Honor, and I do not think there was any justification for it at all.
N.T. 12/2/75 at 144.

2. As noted by my colleagues, this version of the PCHA was repealed effective June 26, 1982 and replaced by the PCRA, 42 Pa C.S.A. §§ 9541 et seq. as amended 1988 and 1995. See majority opinion at page 18, n. 11.

quired by the test they purport to apply. The "context of the whole trial" is lost. Accordingly, it is imperative to examine the record of the trial in some detail.

The trial court concluded that these remarks were motivated in part by conduct and statements of defense counsel in his closing statement to the jury, and the majority agrees. The majority's attempt to sustain a transgression that it concedes "overstepped [the] bounds," Maj. Op. at 200, is based in part upon the majority's conclusion that "[t]his single wayward statement amounts to an ordinary trial error, which is insufficient to constitute a denial of due process." My colleagues emphasize that, "[t]he prosecutor never stated that Werts threatened Moore or that Werts would have Moore killed if he was sent back to the detention center." *Id.* at 200. Indeed, I agree that the prosecutor did not specifically argue that Werts threatened Moore, or that Werts would have Moore killed if Moore was sent back to the Detention Center. However, the prosecutor didn't have to. Subtle suggestion can speak just as loudly as the kind of precise utterance that the majority seems to require as a condition precedent to a denial of due process. The prosecutor skillfully placed the dots upon the page and allowed the imagination of the jurors to connect them. Moreover, as I will discuss, this remark can not be dismissed as a *"single wayward statement"* without rewriting this transcript and ignoring the fabric of this entire trial. The single statement was but one of the many threads that comprise that fabric.

The majority also notes that "[w]hile the trial court made clear that it did not condone the remarks of the prosecutor, it nonetheless found that those remarks were motivated, at least in part, by the conduct and statements of defense counsel in his closing statement to the jury." Maj. Op. at 198. But what is the "opening salvo" that my colleagues find so offensive as to justify the prosecutor's misconduct? The

majority suggests that it is the following portion of defense counsel's closing:

Now, later on that day he [Moore] was supposed to have given a second statement, and we submit it was kind of difficult to get out of the Commonwealth's witnesses, Mr. Moore and also Detective Dougherty, as to what occurred in the second statement because at [sic] the second statement is some hours later and we submit perhaps after Mr. Moore had time to recollect or somebody had said something to him or whatever, he said [in the second statement] the man who was seated on the passenger's side of the car was James Johnson, and he picked out his photograph.

. . . . .

Now, we submit though when Mr. Moore took the stand because of what had been said at the time he entered the plea, because of the fact he knew why he was out, his bail had been changed so he could get out without putting out money, a Federal Detainer had been lifted, he knew he, he testified, he had to say something against the man who is seated here (indicating the defendant), who he described as the defendant … Mr. Moore knew he had to testify in a manner to frame Mr. Werts in [sic] even though we submit he probably did not know who was seated in that car in view of the amount of liquor he had consumed that day, and the fact that he said that the people who were in the car he had never seen before in his life. . . .

Maj. Op. at 198–99, n. 16.

I see nothing improper about that argument, and I do not understand how it could possibly invite or license the prosecutor's unethical conduct. There was some discussion during Moore's testimony about whether he had given a second statement wherein he purportedly identified someone other than Werts as the person in the front passenger seat of the car. This was, of course, before Werts testified and conceded that he was in the car. It

was clearly appropriate for defense counsel to question Moore about his prior identification of someone other than Werts. Defense counsel said nothing in his closing that opened the door to the prosecutor's unsupported insinuation that Moore would be harmed if he remained housed in the Detention Center after agreeing to testify against Werts.

Defense counsel did nothing more than argue that Moore was living up to his end of his bargain with the prosecution, and that his deal included getting released from custody. Moreover, given the risk of flight that is obviously present whenever a murder suspect is released from custody, common sense suggests (and experience confirms) that the prosecution could simply arrange to have Moore housed separately from any of the defendants in this case if it was merely trying to protect him. It was not necessary to arrange his release to the street and allow him to return to the same neighborhood where the conspirators presumably had friends. However, we do not need to speculate about the commonwealth's reasons for arranging Moore's release, even though the prosecution's insinuation certainly invited the jurors to speculate.

Despite the majority's concern with defense counsel's argument that Moore's deal included getting out of jail, the record establishes that that was part of the deal. Yet, rather than concede that the government's deal with Moore included lifting his detainer, the prosecutor attempted to explain Moore's release by arguing that it was a necessary precaution because his testimony against Werts placed him in danger. A closer examination of the record illustrates just how unfounded the majority's use of the "invited response" doctrine is. The following exchange occurred during the trial in the presence of the jury:

MR. MARGOLIN: At this time, the Commonwealth calls Atlee Tyrone Moore.

As required by rules of court, Mr. Moore is here represented by counsel,

Mr. Jack Myers. Furthermore, I would make known at this time that Mr. Moore, on October 24, 1975 before your honor, entered a plea of guilty to murder generally and conspiracy.

In return for his guilty plea, the Commonwealth agreed that it would recommend serious consideration for leniency if he testified against the codefendants.

N.T. 11/26/75 at 39.

During cross examination, defense counsel questioned Moore about the government's efforts to reduce his bail and have his detainer lifted so that he could be released. *Id.* at 79–80. A side bar conference occurred to explain some of the confusion about the amount of Moore's bail. During that conference the prosecutor stated:

"the only thing, he had a federal detainer on him for a charge in Federal court. I do not know what the charge was. I do not know what he was convicted of. All I know, he had a detainer in Federal court and we got the detainer lifted."

MR. CHAPPELLE: when did you get the detainer lifted?

MR. MARGOLIN: Before he signed his own bail to get him out.

*Id.* at 82.

On October 23, 1975, Moore changed his plea and entered a guilty plea to charges related to this robbery/homicide. He walked out of the Detention Center the next day. Following the aforementioned side bar conference, defense counsel used a portion of the transcript of Moore's change of plea colloquy to cross examine him in an attempt to establish bias. That testimony was as follows:

Q: now has anyone made any promises or any agreement in return for your entering a guilty plea, and if so, I want you to tell me.

MR. MARGOLIN: for the record, ... there is an understanding between the defense and the Commonwealth in this case, and I will make that statement for

the record and *in return for the defendant's pleading guilty*, number 1, and number 2, truthfully testifying against the codefendants, four of them in this case, the Commonwealth will at the sentencing proceeding as to this defendant recommend leniency in your Honor's sentencing. . . .

*Secondly, we will recommend that the defendant be permitted to sign his own bail at this time so that he may be released from custody.*

N.T. 11/26/75 at 95–6 (emphasis added). The detainer had to be lifted before Moore could "be released from custody" and the Commonwealth caused that to happen. Pure and simple; his release was part of the quid pro quo. It was not a cautionary measure to protect him from retribution.

Moreover, and what is far more important, it is clear that Moore understood that the detainer was lifted in return for his cooperation. Moore testified that he had been incarcerated from May 7, 1975 to October 24, 1975 but that he was able to walk out of prison one day after changing his plea. He understood that the Commonwealth was offering his release, as well as a recommendation of leniency, in return for his testimony. *Id.* at 93, 98. Moore responded as follows when questioned about his release:

**Q:** someone had taken steps to have the detainer lifted; is that correct?

**A:** as far as I know.

**Q:** in your investigations with the district attorney's office, was there any talk about the detainer being lifted?

**A:** yes.

**Q:** *was it part of the agreement with the DA's office that the detainer be lifted?*

**A:** *yes.*

**Q:** along with recommending to the judge that you be able to sign your own bail; is that correct?

**A:** yes. . . .

**Q:** *That was in return for your plea in this case and also for you to testify*

*in this case against other young men; is that correct?*

**A:** *yes.*

*Id.* at 93–94 (emphasis added).

Thus, if there was any truth whatsoever to the suggestion that Moore was a "marked man" who may end up hanging from his cell because he testified against Werts, the prosecutor had every opportunity to explore that during Moore's testimony in response to defense counsel's suggestion of bias based upon the plea agreement. The prosecutor did not attempt to elicit any information from Mr. Moore to justify lifting the detainer other than Moore's testimony that it was done in return for his cooperation. In retrospect, the prosecutor's omission was a wise one. Rather than pose questions to Moore that may simply have reinforced what Moore was promised, the prosecutor was able to use suggestive sleight of hand to get the jury thinking that Moore was released for his own safety. The prosecutor did not have to worry about what Moore might say if asked anything further about the detainer being lifted, and he could use the suggestive image of Werts' retaliation, instead of evidence, to portray Werts as a killer. The prosecutor's decision is now vindicated. We today join the state courts in rationalizing away the prosecutor's totally unjustified and prejudicial remarks by ruling that they were somehow "invited." That untenable conclusion can only be reached by an unreasonable application of both state and federal law that is entirely inconsistent with this record.

Clearly, had defense counsel not cross-examined Moore about the plea agreement, counsel would have been rendering ineffective assistance under the Sixth Amendment. *See Commonwealth v. Baston*, 242 Pa.Super. 98, 363 A.2d 1178 (1976) (defense counsel ineffective for failing to cross-examine prosecution witness about agreement with prosecution for favorable treatment); *Commonwealth v.*

*Wilson,* 422 Pa.Super. 489, 619 A.2d 1063 (1992) (reversible error for trial court to not allow cross-examination of government's witness as to witness' expectation of favorable treatment in return for testimony). In concluding that the prosecutor's remarks did not deny Werts due process in the context of this trial we place defense counsel on the horns of a Kafkaesque dilemma. Had counsel not explored the possible bias here, his stewardship would have fallen short of that guaranteed by the Sixth Amendment's right to counsel. However, having made an appropriate (indeed required) inquiry into the circumstances of Moore's release, the majority concludes that defense counsel invited the prosecutor's highly improper and prejudicial "reply."

The fallacy in this reasoning is all the greater, and the prosecutor's conduct all the more egregious, because the prosecutor here could have rebutted the argument of bias by simply omitting the "marked man" comment and emphasizing the timing of Moore's cooperation. In his closing, the prosecutor did argue that Moore voluntarily cooperated with police from the very start, before any promise of leniency. He did not have to go further and project the shadow of Moore dangling from the ceiling of his cell in order to meet the argument of bias.

The majority rests its denial of this component of Werts' due process claim in large part upon *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). However, the circumstances in *Young* differ dramatically from the circumstances of Werts' trial. In *Young,* the Supreme Court concluded that any harm caused by the prosecutor's remark "was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks..." 470 U.S. at 17, 105 S.Ct. 1038. Defense counsel there argued in his closing that not even the prosecutor believed his client was guilty. In response, the prosecutor shared his personal belief about the defendant's guilt,

and told the jurors that he (the prosecutor) thought that defense counsel and the defendant were really hoping for a conviction on a lesser charge. In reviewing this tit for tat, the Supreme Court reasoned that a prosecutor should be given more leeway when a response is "invited" by defense counsel's remark *and goes no further* than is necessary to "right the scale." *Id.* at 12–13, 105 S.Ct. 1038. As noted above, the prosecutor's remark here did not "right the scale;" it kicked the scale over.

Secondly, the prosecutor's transgression in *Young* did not suggest that the government's prosecution was based upon any information that was outside of the record. It was merely an exchange of personal beliefs; one triggered by the tendering of the other. That is not so here. The prosecutor's "marked man" remark did suggest evidence outside of the record. It suggested that Moore had received threats and that something more than was disclosed to the jury caused the government to have Moore's bail lowered and his detainer lifted. This does not require any conjecture on our part. It is exactly what the prosecutor told the jurors. Even though the jurors were cautioned that the attorneys' arguments do not constitute evidence, it is hard to imagine how the smell could be ignored once the prosecutor deftly tossed that skunk into the jury box.

Lastly, and perhaps most importantly, the Supreme Court in *Young* noted that the defendant's guilt was established by "substantial and virtually uncontradicted evidence" of his criminal intent, and intent was the only real issue. The Court stated, "the prosecutor's remarks, when viewed in context, [could not] be said to undermine the fairness of the trial and contribute to a miscarriage of justice." *Id.* at 20, 105 S.Ct. 1038. That is certainly not the case here. The evidence of Werts' guilt was neither "substantial" nor "virtually uncontradicted." The majority partially concedes as much. My colleagues state: "we further find that while not overwhelming, the state trial record contains ample evi-

dence of Werts' guilt, which further mitigates the possibility that the jury was prejudiced by the prosecutor's improper comment." Maj. Op. at 200. The majority states that this "ample evidence" is comprised of "Werts' confession and trial testimony, as well as the testimony of Moore, a co-defendant, and several other witnesses," and then attempts to summarize the additional "ample evidence." Maj. Op. at 200–01.

The majority greatly overstates the quality and quantity of the evidence here. The only evidence of the defendant's guilt comes from Moore's courtroom testimony, the defendant's confession (which he insists was coerced by Detective McMillan), and the denials of Detective McMillan. Although such evidence seems, at first blush "ample," examination of the totality of the circumstances here makes it far less impressive. I will say more about the circumstances of Werts' statement below. For now, in order to better assess the quality of the evidence against Werts I will set forth a summary of the testimony of each of the witnesses.

## A. DETECTIVE DOUGHERTY

The prosecution first called Detective Dougherty. Dougherty is a homicide detective who initially testified generally, giving a description of the crime scene and an explanation about his processing of it. N.T. 11/26/75 at 35. He was subsequently recalled by the prosecution to detail the circumstances surrounding the taking of Werts' statement and to explain the chronology which the homicide detectives keep when interviewing and questioning a suspect. N.T. 11/28/75 at 133–4. He also testified that he gave Werts his *Miranda* warnings, and he testified about the circumstances of those warnings. He answered some questions about his interrogation of Moore, identified Moore's statement, and was asked about Moore's identification of someone other than Werts. N.T. 12/1/75 at 39–40.

As my colleagues note, Detective Dougherty also testified about the fresh "brush burns" that he observed on Werts upon the latter's arrival at the police station. My colleagues conclude that a jury could find that those injuries "were consistent with what you would expect to see when a shirtless individual is pulled through a two-foot by two-foot opening, . . . as opposed to injuries sustained in a beating." Maj. Op. at 201. Dougherty also testified that Werts appeared normal, "did not complain to him of any physical ailments, and refused medical treatment when asked if he wanted it." *Id.* However, Werts admitted that he had hid in a two-foot crawl space when the police came for him (though he stated he came out under his own power once police grabbed him by the arm). N.T. 12/1/75 at 152–3. Werts testified that he did ask Dougherty for medical treatment upon arriving at police headquarters, but that Dougherty refused to get him treatment because Werts wouldn't sign a statement that had been prepared. *Id.* at 160–2.

I will separately discuss below the issues that arise from the prosecutor's subsequent vouching for the police testimony. That vouching takes on added significance because of the discrepancies between Werts' testimony about the circumstances of his arrest and interrogation, and the homicide detectives denials of coercion and abuse. For now I will simply note that if the jury doubted the veracity of the police officer's denials there was precious little to convict Werts. The only other evidence that was introduced against him came from alleged coconspirator, Altee Moore.[3]

**3.** My colleagues argue that Werts' claim that his confession was coerced "cannot weigh in our decision here" because it was rejected by the jury and the state courts. Maj. Op. at 200, n. 19. I do not suggest that the jury should have accepted Werts' claim of coercion or that the state courts erred in rejecting that claim. That is clearly not for us to determine. However, under *Young,* we must assess Werts' claims in the context of the entire record. The record contains a confession wherein Werts purportedly told police that he

## B. ALTEE MOORE

The prosecution's next witness was Altee Moore. The majority accurately summarizes Moore's testimony. It is significant, however, that Moore's testimony could be summarized as saying that Werts was present in the car with three other individuals and Moore when they drove to the speakeasy. Moore agrees that Werts did not go into the speakeasy and did not drive the car. Moore did, however, testify that other individuals in the car mentioned robbing the speakeasy in Werts' presence. Even accepting Moore's testimony that the others mentioned the robbery in Werts' presence, the quality of Moore's testimony is such that it may well not have overcome a "mere presence" defense. Without more, it certainly would have entitled Werts to a "mere presence" instruction. *See Commonwealth v. Fields,* 460 Pa. 316, 333 A.2d 745 (1975). The only real difference between the testimony of Moore and the testimony of Werts is that Moore did not specifically say that Werts was asleep while he sat in the car prior to the robbery. Moore did not say whether Werts was awake or asleep.

The majority stresses Moore's failure to specify if Werts was awake or asleep in their rejection of my position that Moore's testimony would have supported a mere presence charge under Pennsylvania law. Surprisingly, my colleagues argue "[n]either the prosecutor nor defense counsel chose to *clarify* [whether Werts was asleep]." Maj. Op. at 200, n. 19 (emphasis added). I find this surprising because the prosecution obviously has the burden of proof, and I don't understand how we can expect defense counsel to clarify a crucial point that the prosecution fails to prove. I submit that no defense counsel worth his

or her salt would "clarify this point." What is significant is not that defense counsel chose not to clarify the point, but that the prosecutor failed to prove it. However, here again, the prosecutor's decision to not inquire is vindicated just as his decision not to ask Moore about the terms of the plea agreement is vindicated.

## C. ISRAEL WRIGHT

The prosecution next called Israel Wright who was inside the speakeasy at the time of the robbery. Wright's testimony simply corroborated the uncontested fact that the speakeasy had been robbed and that Mr. Bridgeman had been shot during the course of that robbery. N.T. 11/26/75 at 112–121. Wright's testimony added nothing to the case against Werts.

## D. OFFICER CARROL ADAMS

The Commonwealth's next witness was Police Officer Carrol Adams. Adams drove the emergency patrol wagon that responded to a police radio call about the robbery at the speakeasy. Officer Adams also described the crime scene and what he saw upon entering the speakeasy, and he testified about taking the gunshot victim to the hospital. *Id.* at 124. Officer Adams' testimony also added nothing to the case.

## E. DR. ROBERT SEGAL

Dr. Robert Segal, medical examiner, testified about forensic pathology generally, and, more specifically, the details of his autopsy of the victim. N.T. 11/28/75 at 3 and 4.

disposed of weapons after the robbery/homicide. I submit that if the record contained only that evidence, there would be precious little to suggest a denial of fundamental fairness or cause one to question the conviction. The record contains more. It includes an explanation of that statement which we must at least consider in determining if the integri-

ty of this conviction has been undermined by the assertions in Werts' habeas petition. Moreover, as I will note below, there are additional factors here which I believe impugn the integrity of this conviction to an even greater extent than might otherwise be the case.

## F. OFFICER JOHN O'ROURKE

Police Officer John O'Rourke was called as a firearms specialist and was asked about his examination of a .22 caliber bullet fragment taken from the victim during Dr. Segal's autopsy. *Id.* at 12–14.

It is evident from this summary that, thus far, the only testimony that incriminated Werts came from Mr. Moore, and Moore's testimony was not nearly as incriminating as the majority seems to conclude. It places Werts in the car that drove to and from the speakeasy. Moore didn't say that Werts participated in any other way. He didn't even say Werts was awake. As noted above at n. 3 that testimony was not inconsistent with the defense of "mere presence" under Pennsylvania law even assuming Werts was awake. *See Fields, supra.*

## G. DETECTIVE McMILLAN

The prosecution next called Detective Roseborough McMillan who testified about the details of his arrest of the defendant. McMillan testified that he and several uniformed officers and other detectives went to the defendant's house on June 8, 1975. He described the circumstances of their search for, and apprehension of, Werts inside the house. He also described a struggle with the defendant that could have explained some of the marks or injuries that the defendant sustained. During his testimony, the detective was also asked, "and then what happened?" Detective McMillan responded as follows: "we proceeded to search the house, search for a weapon, and during the search for the weapon I found several articles of clothing that had been reported stolen." N.T. 11/28/75 at 21. A defense objection was sustained. Defense counsel also moved for a mistrial, but that was properly denied because the trial court immediately gave a curative instruction. *Id.* at 23.

The detective testified about some abrasions and possible injuries that he observed on the defendant and explained that, to the extent that they were inflicted by the police at all, they were inflicted as a result of trying to drag Werts from his hiding place, and subdue him. *Id.* at 61–3. The detective also offered some rather bizzare testimony that after police subdued Werts and handcuffed him, he (Detective McMillan) ordered that the handcuffs be removed. Werts would testify that McMillan had the handcuffs removed as part of an overture to fight. N.T. 12/1/75 at 157. McMillan explained that he wanted the handcuffs removed so that Werts would be free to walk around the room and point to where a shotgun was hidden. N.T. 11/28/75 at 83. McMillan specifically denied that he wanted the handcuffs removed so that he could fight with Werts. He testified that he told Werts " 'I wouldn't hit you. If I did, I'd rip your head off', or words to that affect[.]" *Id.* at 119, and he denied using threats, force or intimidation to coerce Werts' statement.[4]

## H. DETECTIVE VERRUGGHE

The prosecution next called Detective Arthur Verrugghe who testified about finding a white 1965 Ford Falcon outside of the defendant's residence. He also testified that he searched that car on June 8, 1975. *Id.* at 128. The car that took the perpetrators to the speakeasy had been described as a white Ford Falcon. However, Werts didn't deny that he was in this car. His testimony, as the majority notes, was that he paid someone else to drive him home because he was drunk.

My colleagues argue that Detective Verrugghe's testimony that the Ford Falcon was found parked outside Werts' house the day after the shooting is very significant because "[i]t defies logic to suggest that Werts paid someone just to drive him home because he was drunk when the

---

4. The record establishes that the Detective was over six feet tall, and weighed more than 300 pounds.

white Ford Falcon was still parked outside Werts' residence the day after the shooting. Detective Verrugghe's testimony lends credibility to Werts' confession as opposed to his later denial ... of his participation in the robbery." Maj. Op. at 30. However, there is nothing in this record to establish where Vann (the one who was driving the car) lived. Moreover, Werts' car was connected to a homicide. It is not all that surprising that Vann did not want to have the car parked in front of his own home, and there is nothing here to suggest that he could not have driven Werts home and then walked to his own home, or taken public transportation.

So that I am clear, I do not for a minute suggest that the evidence here is not sufficient to convict Werts. It clearly is. I do submit, however, that it is nowhere near as compelling as the majority suggests, and that the quality of the Commonwealth's evidence is relevant to our assessment of Werts' due process claim. In that regard, I submit that testimony about the location of the car does not "defy logic" nearly as much as Detective McMillan's testimony that he wanted Werts' handcuffs removed so that Werts (whom McMillan believed to be a killer) could wander around his bedroom and point to where a (presumably loaded) shotgun was hidden. To that extent, logic suggests that McMillan's testimony corroborates Werts' claim that McMillan threatened him. However, as I discuss below, McMillan, and the other police officers had the advantage of an Assistant District Attorney vouching for their honesty, and integrity.

## I. WILLIE BRIDGEMAN

Finally, the prosecution called Willie Bridgeman, the decedent's brother. Bridgeman merely testified that his brother had been alive prior to the time of the robbery. This fact was never in contention.

## J. DEFENSE WITNESSES

The other witnesses that the jury heard from included the defendant, who testified that he was drunk, had paid someone to drive him home, and that he was sitting in the front passenger seat asleep when the speakeasy was robbed, and that he knew nothing of the robbery until after it was over. Werts admitted signing a statement that the police prepared, but said the police prepared it based upon what others had already told them. He said that he only signed it as a result of the combined effect of police coercion, force and intimidation; and the heroin withdrawal he was undergoing. The jury also heard from various members of the defendant's family who testified about the circumstances of his arrest.

Werts also said that Detective Dougherty welcomed him to the police station by saying, "[y]ou already had some trouble with McMillan and what he did, he is going to get nasty, ..." N.T. 12/1/1975 at 159, and that McMillan said, " '[w]ait until I get you down at the police station[ ]' " when Werts was being taken from his home for interrogation. *Id.* at 157.

The defense also called Detective Dougherty as its own witness to testify that Moore had initially identified someone other than the defendant as being in the front passenger seat of the car that drove to and from the robbery. N.T. 12/1/75 at 38–40. Finally, the defense called an expert to testify about the impact of heroin withdrawal in order to corroborate the defendant's testimony about the circumstances in which he gave his statement. That testimony established the pain and discomfort that someone with a heroin habit the size of the defendant's would have been enduring at the time Werts was taken into custody and questioned by police.

Thus, I am at a loss to understand what "several other witnesses" in addition to the testimony of Moore, and Werts' confession could amount to such overwhelming evidence as to negate the seed that was plant-

ed in the jury's mind by the prosecutor's image of Mr. Moore hanging from his cell. However, if the "marked man" comment was the only impropriety here I would agree that the question of a due process denial is a far closer call. My conclusion that "the fairness of the trial" was undermined and that the prosecutor's actions "contributed to a miscarriage of justice[.]" *Young*, 470 U.S. at 20, 105 S.Ct. 1038, is based upon much more.

## III.

### THE PROSECUTOR'S OPENING STATEMENT

Within minutes of the jury being sworn, before any testimony had been offered, and days before defense counsel delivered the closing that supposedly "invited" the prosecution's misconduct, the prosecutor gave his opening statement. During his opening statement, he told the jury:

> [T]here is something more interesting about this case. Atlee Tyrone Moore is one of the co-defendants. And Atlee Moore will testify here and tell you how this was planned and what happened. And make no mistake about it, Atlee Tyrone Moore pled guilty to murder generally....

> In accordance with the American Bar Association standards relating to criminal justice, the Commonwealth agreed, in return for Atlee Moore's testimony, we would recommend that His Honor be lenient. His Honor exercise and give serious consideration to leniency *because Mr. Moore is obviously going to put his life in his hands by testifying.*

N.T. 11/26/75 at 13 (emphasis added). That uninvited, inappropriate, unsubstantiated, and highly prejudicial comment is also part of the context of the trial that must be examined to properly consider Mr. Werts' due process argument.

The majority concludes that Werts has waived his right to challenge this comment because trial counsel did not object at trial, and it was not included as a basis for a due process denial in Werts' direct appeal. However, trial counsel's failure to object was one of the grounds for Werts' claim of ineffective assistance of counsel in the subsequent PCRA petition. The PCRA court ruled that Werts' ineffective assistance of counsel claim was meritless because counsel had a sound strategic reason for not objecting. During a hearing that was held on Werts' PCRA petition, trial counsel explained that he did not object to this portion of the prosecutor's opening because he thought that the prosecutor's insinuation that Moore was putting himself in danger "cut both ways" and that it would backfire. *See* N.T. 4/29/82 at 38–9. Defense counsel explained that he "thought it was going to backfire against him because I knew we were going to present evidence that they had a deal and really that this guy was never in fear of his life." *Id.* at 39.

I agree that counsel's failure to object was rooted in sound strategy that defeats that portion of Werts' ineffective assistance of counsel claim. However, that does not explain why trial counsel did not include the "life in his hands" comment as part of the circumstances which denied Werts due process of law on direct appeal. The Pennsylvania courts evaluate inflammatory remarks in context with the entire trial just as we do.[5] Strategy that justifies

---

**5.** *See Commonwealth v. Dennis*, 552 Pa. 331, 715 A.2d 404, 413 (1998) ("It is fundamental that, 'in order to evaluate whether [the prosecutor's] comments were improper, we must look to the context in which they were made'") *See also Commonwealth v. Dickerson*, 406 Pa. 102, 109–110, 176 A.2d 421 (1962) (The court noted that it evaluated the defendant's claim that the prosecutor's closing argument denied him the fundamental fairness required by the Due Process of Law by noting, "a careful study of the record in its entirety disclosed no real merit to this contention." The court added, "[e]mphatically the district attorney should always bear in mind his proper role in a trial of such great import, and religiously refrain from conduct unbecoming such a responsible trust.... We cannot urge upon district attorneys too strongly the need for refraining from such conduct.")

not objecting (and therefore waiving that omission as part of a Sixth Amendment claim) does not justify not including the prosecutor's opening as part of the circumstances that denied Werts the due process of law on direct appeal. The remark was as uncalled for and inflammatory as the "marked man" statement that was challenged on direct appeal as part of a due process claim.

Werts' guilt was based solely upon vicarious liability and the law of conspiracy. With the exception of the denials of Detective McMillan, the prosecutor's unsupported innuendo said much more about Werts' involvement in this robbery/homicide than the evidence that was presented from the witness stand. The prosecutor's opening planted the idea that Moore's life was in danger because he dared to testify against a killer—Werts. That suggestion lay just beneath the surface from the very beginning of the trial until the prosecutor detonated it with his unethical "marked man" closing. Thus, although I agree that trial counsel's failure to object to the opening was not ineffective assistance of counsel, I can not agree that we are free to ignore the prosecutor's opening as part of our analysis of Werts' due process claim. That issue is separate and apart from the issue of competence of counsel. Failure to include the prosecutor's opening as part of the due process violation alleged on direct appeal is just as surely as ineffective as the failure to object was strategic.[6]

Therefore, we would have to consider the prosecutor's opening to properly evaluate the context of the "marked man" comment even if Werts could not show cause and prejudice to excuse the omission from the due process claim. Werts can, however, show "cause" for not exhausting that component of his due process claim. *See Lines v. Larkins*, 208 F.3d 153, 166 n. 20 (3rd Cir.2000) ("a successful challenge to the effectiveness of counsel's representation on direct appeal under *Strickland* can establish the necessary cause to excuse a procedural default"). The "cause" is counsel's ineffectiveness in not arguing the proper context of the closing. The prejudice that he also must establish to excuse the default ought to be evident on this record. *See Coleman*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640; *Lines*, 208 F.3d at 159. Werts also alleges that his statement was obtained as a result of Detective McMillan's coercion. That claim, in the light of all the circumstances, can not be lightly dismissed.[7] The prosecutor's handling of McMillan's testimony is yet another part of the web of misconduct that adds up to a denial of due process in the circumstances here.

## IV.

## THE PROSECUTOR'S IMPROPER VOUCHING FOR DETECTIVE McMILLAN

As noted above, the evidence against Werts boiled down to the testimony of

---

**6.** Counsel's failure to include it as part of his direct appeal is all the more unreasonable because the sidebar exchange that followed the prosecutor's closing suggests (the only on-the-record reference about anyone fearing for their safety) that it was actually Werts who was concerned about threats. At side bar defense counsel told the trial court that he had informed Judge Savitt that the defendant was fearful of his life. We can not, of course, determine the veracity of that representation at this time, nor does the record reflect anything more about the reason for Werts' purported concern. It is significant, however, because it further suggests that trial counsel's failure to include the prosecutor's opening as a basis for a claimed due process deprivation was unreasonable.

**7.** The Pennsylvania Supreme Court concluded that Werts' claim that his "confession was the product of physical and mental coercion" was waived on direct appeal. *Commonwealth v. Werts*, 483 Pa. at 226, n. 2, 395 A.2d 1316. However, to the extent that it was waived, it is obvious that Werts can establish the ineffective assistance of counsel necessary to excuse the default under *Coleman*. In addition, we can not ignore that claim now because (as appellate counsel asserted at argument before us, and as I discuss further below) the prosecutor's vouching for the homicide detectives was an important part of the context of this trial.

Altee Moore, and Detective McMillan's denial of Werts' charge that McMillan used force, intimidation, and coercion to obtain Werts' confession.[8] If the jury doubted the veracity of the police who testified, and believed instead that McMillan had coerced Werts into signing a false statement, the case would boil down to Werts' denial of criminal intent and testimony (much of which Werts himself offered) placing Werts in the car under circumstances that were less than compelling insofar as they were offered to establish Werts' involvement in the conspiracy to rob the speakeasy. As I have previously stressed, it was the challenged statement wherein Werts purportedly told police that he helped dispose of a gun after the robbery that unequivocally established vicarious liability for William Bridgeman's murder by establishing that Werts was part of the conspiracy.

It is against this background that the prosecutor saw fit to vouch for Detective McMillan's credibility, and that of the other detectives in the case. In his summation, the prosecutor responded to Werts' testimony that McMillan used force and threats of force to extract the statement as follows:

Now, let me first comment on defense's allegation that the police had certain attitudes. Now, you heard Detective Dougherty and you saw him. Detective McMillan and you saw him. Detective Gerard and you saw him. These men are assigned to a homicide division of the Philadelphia Police Department, top division department. They are professionals. They have worked in the police department for a number of years. They have testified to that. They have been employed as policemen for a number of years. If they had certain attitudes to color their thinking in cases, they would not be in the homicide division. They have to be professionals in work. They can not bring in people and beat them every time they come in to get statements out of them. It just does not work like that. Their job does not mean they could stand there and beat defendants every time they bring a defendant in.

N.T. 12/2/75 at 106–7.

In *U.S. v. Young*, the Supreme Court explained the danger of this kind of prosecutorial vouching. The Court stated:

The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges ... and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

470 U.S. at 18–19, 105 S.Ct. 1038.

Here, there is reason to believe that both of these dangers undermined the fairness of Werts' trial. First, the insinuation that Moore's life was in jeopardy certainly suggested that there was evidence beyond that which was admitted at trial that supported the charges and which established that Werts was a killer. Secondly (and more directly insofar as the vouching argument is concerned), the prosecutor was telling the jury that these "professionals" thought that Werts was guilty, and that "professionals" would not obtain a statement by coercion. The jury may well have been lulled into trusting those professionals more than their own independent view of the evidence. This latter danger is amplified here because the prosecutor also argued that McMillan thought that Werts was a killer during the course of his closing argument. Although I do not think that remark establishes a due process violation by itself, it certainly exacerbated the danger that jurors would base their verdict

---

8. According to Werts' testimony, the coercion was amplified because Werts was undergoing heroin withdrawal at the time of his interrogation.

more on McMillan's view of Werts than on the strength of the evidence against him. The government placed its imprimatur upon McMillan's experience and professionalism, and the prosecutor suggested that Moore's life was in danger because he testified.

Given the purported threats, the fact that the trained professionals in the city's "top division" thought Werts was a killer, and the fact that McMillan had told the jury that police found stolen clothing in Werts' bedroom, I can not understand how the majority can so confidently conclude that Werts' conviction is not so seriously undermined by prosecutorial transgressions as to deny Werts the due process of law. Also, no immediate curative instruction was offered to cure the prosecutor's improper vouching because trial counsel failed to object.[9]

Moreover, the prosecutor's enthusiasm for the professionalism of the homicide detectives, and his haste to vouch for their credibility is even more questionable than appears at first blush. As noted above, Detective McMillan managed to gratuitously inject in his testimony that he had found articles of stolen clothing in the defendant's bedroom. Given the countless times Detective McMillan must have testified during his 19 years on the police force, it is inconceivable that he did not know that it was highly improper to mention that stolen clothing. Nevertheless, he proceeded to do it. The prosecutor then ne-

gated the cautionary instruction that had been given by embroidering the remark during his closing and admonishing the jurors that they ought not to believe a heroin addict and a thief. N.T. 12/2/75 at 34. He argued, "if you want to believe a dope addict and a thief, you can, but . . . ." The only evidence I have been able to find on this record that Werts was a thief came from Detective McMillan. An objection to that testimony was sustained, and a cautionary instruction was immediately given, but that did not stop the prosecutor from adding that poisoned arrow to his quiver, and launching it as part of his summation.

In *United States v. Rodarte*, 596 F.2d 141 (5th Cir.1979) the Court of Appeals for the Fifth Circuit held that a district court did not abuse its discretion in finding that the prosecutor's suggestion that there was no reason for drug enforcement agents to come into court and make up a big story was improper. However, based partly on the strength of the government's case, the court reasoned that a new trial was not warranted. *Id.* at 146. In *United States v. Garza*, 608 F.2d 659 (5th Cir.1979) the government's case rested heavily on the testimony of a confidential informant and an undercover agent. When speaking of the agent in his opening, the prosecutor stated:

And there isn't any reason in the world why [the agent] would take that stand. He's a professional man. He has been in this a long time. And if he

9. The majority finds that "Werts is excused from the exhaustion requirement as to the vouching statements." Maj. Op. at 193. My colleagues conclude, however, that we are still unable to review the merits of that claim because it is procedurally defaulted and Werts has not established "either cause and prejudice" or a "fundamental miscarriage of justice." *Id.* However, I disagree. At page 25 of Appellant's brief, present counsel notes that "the prosecutor also vouched openly for the credibility of the homicide detectives. . . ." Appellant's Br. at 25. Appellant then notes the only explanation given for "his failure to object to the prosecutor's remark in closing argument," which counsel acknowledged were " 'very egregious' " was that counsel pro-

fessed being too embarrassed to do so. *Id.* at 31. Appellant then argues that trial counsel's failure to seek curative instructions as well as failure to challenge the prosecutor's remarks in closing on "direct appeal" constituted ineffective assistance of counsel and that it limited the review on appeal to "plain error due to counsel's failure to properly preserve the claim" *Id.* at 33. However, even assuming that trial counsel's failure to object to something as egregious as vouching for one of the main witnesses against his client was reasonable, the prosecutor's vouching for the homicide detectives must also still be considered as part of the fabric of the context when we evaluate Werts' due process argument.

wasn't good at it over there when he was doing it for the San Antonio Police Department, if he wasn't doing his job right over there, do you think he would ever have gotten on with the Drug Enforcement Agency.

*Id.* at 659. The prosecutor continued on this theme by stating that the agent and the confidential informant had no reason to point out that the defendant was the guilty person, unless they believed it. In rebuttal, after defense counsel's closing, the prosecutor asserted that the motives of both the informant and the agent were as "pure as the driven snow. Their motives are to get out and make this world a better place to live in." *Id.* at 662. Even though defense counsel failed to object to the comments at trial, the Court of Appeals concluded that the comments constituted "plain error" and granted habeas relief. *Id.* at 666. In both cases, the courts based their decisions in large part upon the strength of the government's evidence, just as the Court did in *Young.* The court in *Garza* granted relief because it believed that the remark had a substantial impact on the outcome of the trial while in *Young* and *Rodarte* overwhelming evidence of guilt was sufficient to overcome the impact of the prosecutor's improper conduct.

In *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) the Court upheld a conviction despite a prosecutor's improper remark in closing in part because the trial court "took special pains to correct any impression that the jury should consider the prosecutor's statements as evidence in the case." *Id.* at 644, 94 S.Ct. 1868. In doing so, however, the court warned that curative instructions will not always be sufficient. "Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character." *Id.* As noted above, in *Donnelly* the prosecutor simply told the jury what he believed the defense team was hoping with regard to a jury's verdict. Here, rather than

remedying the problem, the court's final instruction may well have exacerbated the prosecution's assurances about Detective McMillan and negated its initial cautionary instruction about the stolen clothing. The court's jury charge included the following:

[i]t should not be inferred from what I have said that you are to ignore or disregard the comments of the District Attorney or defense counsel in what they have said to you in their respective addresses. It is not only your right, but it is your duty to consider these arguments and to view the evidence in light of the arguments presented to you, but you have the right to reject any or all of the arguments.

App. at 158. Such an instruction on the heels of the prosecution's declaration of Detective McMillan's professionalism, and the prosecutor's reminder that the detective thought Werts (the "thief") was a killer may well have caused the jurors to believe that they had a duty to consider the conflicting testimony of Werts and McMillan in that light. We routinely state that we assume that jurors follow a court's instruction when we affirm a conviction. Can we now ignore that principle because it undermines a conviction? Even though the court told jurors they did not have to accept arguments of counsel, the presumption that they followed the court's charge certainly suggests that they did resolve conflicts between Werts and McMillan by considering the latter's professionalism, job assignment, and personal belief that Werts was a killer. After all, the prosecutor reminded the jury that Werts was a thief and therefore not worthy of belief anyway. See *Young, supra.*

The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. The same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicial-

ly reached conclusions on relevant facts that tend to show he's guilty.

*Hall v. United States,* 419 F.2d 582, 583–84 (5th Cir.1969).

As if that were not enough, there is a sad irony here that even more graphically illustrates how misleading and dangerous this kind of vouching can be. The heart of Werts' defense was that Detective McMillan coerced a false inculpatory statement by using force, intimidation and coercion, and that the other detectives played on Werts' fear of McMillan. Despite the prosecutor's guarantee that McMillan was a professional assigned to a top division in the department and that [homicide detectives] could not be so assigned if they had "certain attitudes to color their thinking in cases" because "they have to be professionals at work" and "cannot bring in people and beat them up ...", Detective McMillan was subsequently convicted of doing exactly that in an investigation which he conducted within months of his interrogation of Werts. It is as tragic as it is ironic that Detective McMillan, along with five other members of the homicide division of the Philadelphia Police Department, was subsequently convicted of violating the civil rights of witnesses during the course of a homicide investigation they were involved in during October of 1975. We subsequently affirmed that conviction in a published opinion, *see United States v. Ellis, et al.,* 595 F.2d 154 (3d Cir.1979). That opinion is, of course, a matter of public record and I will take the liberty of referring to it.

In *Ellis,* we summarized the evidence insofar as it pertained to Detective McMillan as follows:

> [a]fter [the suspect] had gone over his statement four or five times, maintaining his innocence throughout, [two other detectives] were joined in the interrogation room by defendant McMillan. The latter told [the suspect] that there were three or four counts of murder against him and that the police had an eyewitness. McMillan then punched [the suspect] in the chest. As [the suspect] fell to the floor from the blow, McMillan, who then weighed over three hundred pounds, slapped him across the side of the face with tremendous force. As McMillan left the room, he said to [the other detectives] that if they needed him he would return and deliver a punch which would stop [the suspect's] heart.

*Id.* at 157.

That evidence has an eery resemblance to some of Werts' description of how the detectives interacted with him and McMillan here. McMillan's subsequent, unrelated conviction for various civil rights violations does not establish the veracity of Werts' allegations here. However, I submit that it ought to give us additional pause before we assume that Werts' claim is as unjustified as the vast majority of countless similar claims that arise in petitions for habeas relief. The government's successful prosecution of McMillan is also noteworthy because it demonstrates how misleading the kind of vouching that occurred here can be, and why courts have expressed so much concern about the tactic. It is an example of what can happen to the proverbial "search for truth" when adversarial zeal enlists platitudes and cliches to vouch for a witness rather than reasoned analysis based upon the evidence.

Sadly, as if all that I have pointed to were not enough, there is yet one more remark that can not be ignored. In that remark, the prosecutor pulled the genie of racial bias out of the bottle.

## V.

## THE PROSECUTOR'S ASSERTION THAT "THIS IS THE WAY PEOPLE ARE UP THERE"

As the majority notes, during his closing argument the prosecutor sought to explain why people would be sitting around drinking and decide to commit a robbery "out of the clear blue." He argued:

Moore testified that it was May 6 in the evening, . . . he was at home drinking and they came to the house and Butch Jones came up to him and they went outside and Butch Jones was looking for a place to rob. *Bear in mind, this is the way people are up there.* They are sitting at home doing nothing and they decide to rob a place just out of the clear blue.

App. at 145, Maj. Op. at 205 (emphasis added).

The majority deftly parries this blatant appeal to bias by concluding that the "remark of the prosecutor appears to be a fair comment on the evidence presented at trial, which established that Werts' accomplices were at Moore's house on the day of the crime, trying to decide on a place to rob." *Id.* Had the prosecutor argued: "this is the way *those people* are up there," I would hope that my colleagues would better be able to recognize this remark for what it was. I hope that they would concede that the latter is nothing more than a cheap, highly inappropriate attempt to exploit the fact of the defendant's race and class. Werts (as will be evident to most from the prosecutor's comment) is Black, and the neighborhood where Moore lives is an impoverished Black neighborhood in North Philadelphia. I can not imagine that the prosecutor would have ever made such a remark if Moore lived in an area in northern Philadelphia that is predominately White and upper class. Chestnut Hill is such a neighborhood, and it strains credulity to the breaking point to suggest that the prosecutor would have argued that "this is the way people are *up there* " had the same set of circumstances occurred in Chestnut Hill. Yet, that community is no less "up there" than North Philadelphia.[10]

Yet, even casting aside what I believe to be a naive assessment of this remark, the majority's conclusion that this reference to

"those people" is a "fair comment on the evidence" is still as regrettable as it is inaccurate. The *evidence* here shows as much. Despite the prosecutor's comment that testimony about idle drinking while plotting a robbery is the way people are in that neighborhood, Israel Wright testified about what some of "those people up there" were doing at the time of the robbery. He was inside the speakeasy speaking with the decedent. Wright testified that just before the robbery occurred he and the decedent were "talking about each others' family and asked about what we was doing. [The decedent] started explaining that he was learning computer programming and he had finished the first stage and he was going into the second state of computer programming and he was telling us how he go about doing it." N.T. 11/26/75 at 115–6. That is what some of the people "up there" were doing, and that is the way some of the people "up there" are. Yet, the majority can somehow conclude that the prosecutor's blatant condemnation of the character of an entire neighborhood is a "fair comment on the evidence." Apparently because 4 or 5 people in that neighborhood were engaged in a criminal conspiracy.

This kind of insinuation and tactic ought not to be dismissed as mere adversarial hyperbole. It is something that the law forbids and society can ill afford. It is a not-so-subtle appeal to the subconscious bias that has absolutely no place in any courtroom, let alone one where a man stands accused of murder. "The introduction of this irrelevant material prejudiced appellant by casting him in the eyes of the jury as a member of a group with values allegedly alien to the rest of society, therefore, implying that it was more likely that he committed the crime charged." *Commonwealth v. Tirado,* 473 Pa. 468, 472, 375

---

**10.** This concern is not mitigated by the fact that Detective McMillan is himself Black. The jury would not associate Detective McMillan as being like the people who lived "up there." Moreover, the prosecutor had already improperly vouched for Detective McMillan's veracity by assuring the jury that he would not hold the position that he held but for his professionalism and, (inferentially) integrity and credibility.

A.2d 336 (Pa.1977)(ordering new trial because of admission of evidence purporting to show character trait specific to Puerto Rican males which implied a greater likelihood of commission of the crime charged). See also *United States v. Vue,* 13 F.3d 1206, 1212–3 (8th Cir.1994)(holding that prosecutorial arguments associating members of a particular ethnicity and from a particular geographic region with the commission of drug-related offenses violated the defendant's constitutional rights); *United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973).

The majority notes that Werts' claim that this comment was a racially motivated attempt to inflame jurors was never presented to the state courts, and that we can not now consider it. Maj. Op. at 205. However, appellate counsel seeks to establish the prerequisite "cause" by arguing that failure to make that argument was ineffective assistance of counsel to the extent that it was not presented to the state courts in the context in which it is now argued. See App. Br. at 24 and 31.

Appellate counsel notes that trial counsel's only explanation for failing to object to this comment was that he was too embarrassed to do so. App. 154. Clearly, that is not adequate. It is clearly not an omission based on a reasonable defense strategy. Moreover, even assuming *arguendo* that "cause and prejudice" does not exist to excuse the failure to challenge the comment earlier, the context of that statement remains part of the background of the trial that the state court would have considered to properly adjudicate Werts' claim that the prosecutor's conduct deprived him of a fair trial. But the state court did not even address Werts' due process claim outside the context of a Sixth Amendment claim of ineffective assistance of counsel. I do not think we are free to ignore it in that context merely because it wasn't addressed in the same light that we are asked to view it. *See Commonwealth v. Dickerson,* 406 Pa. 102, 109, 176 A.2d 421 (1962) (the Court reject-

ed defendant's assertion that "certain conduct and statements of the district attorney during trial deprived him of a fair trial" by noting "[a] careful study of the record in its entirety disclosed no real merit to this contention").

It is difficult for me to imagine any context other than a racial one that would cause someone to refer to residents of a poor urban Black neighborhood north of central Philadelphia by saying: "this is the way people are up there." This was particularly true given the racial polarity that existed in this city at the time. *See generally,* Chuck Stone, *Hating Blacks as Sick as Hating Cops,* Phila. Daily News, March 3, 1976, at 10 (speaking generally of the harsh racial climate existing in Philadelphia during the mid–1970's). Use of that stereotype was blatantly improper, and (unlike my colleagues) I can find no justification for it. "Appeals to racial or religious prejudice are especially incompatible with the concept of a fair trial because of the likelihood that reason would be dethroned and that bias and emotion will reign." *Tirado,* 473 Pa. at 472, 375 A.2d 336.

## VI. CONCLUSION

No one can now conclude to a mathematical certainty that an innocent man has been convicted here. However, mathematical certainty is not the test. Rather,

"[w]e consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction. As the Supreme Court has emphasized, 'a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context.' "

*U.S. v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir.1995) (*en banc*) (quoting *U.S. v. Young,* 470 U.S. at 11, 105 S.Ct. 1038).

Given the nature and frequency of the transgressions that occurred during this trial I am concerned that one reading the majority opinion may conclude that we simply put on blinders, ignored the dictates of fundamental fairness and the Supreme Court's pronouncements in *Young*, got out a rubber stamp, and stamped this conviction and the denial of Werts' petition, "affirmed." Moreover, I fear that if Werts is not entitled to habeas relief, there is precious little left of the "Great Writ." Our failure to grant relief in the face of this record licenses the very kind of misconduct that we continually purport to condemn. We are vindicating the misconduct by allowing this verdict to stand. Although Werts may not be able to establish that a denial of due process resulted from any one of the asserted grounds for error, the aggregate of what happened in context with the government's evidence is what we must consider.

"Our review of a prosecutor's conduct in a state trial on application for a writ of habeas corpus is limited to determining whether the prosecution's conduct so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Ramseur*, 983 F.2d at 1239 (citing *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618) (internal quotations omitted). The district court clearly erred in denying Werts' petition without even addressing his due process claim, and we are placing the final nail in that error by affirming the district court's judgment. This case clearly establishes a violation of the fundamental fairness that is the bedrock of the due process of law that ought to be afforded everyone in a criminal trial, *Brecht v. Abrahamson*, 507 U.S. 619, 633, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Accordingly, I must forcefully, but respectfully, dissent.

